**STATE of Tennessee, Appellee,**

v.

**Oddie Lee NELSON, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

June 27, 1980.

John C. Zimmermann, Asst. Atty. Gen., Nashville, Douglas Bates, III, Asst. Dist. Atty. Gen., Centerville, for appellee.

Robert E. Burch, Dickson, for appellant.

## OPINION

DAUGHTREY, Judge.

In this case we are asked to reverse the defendant's conviction on two incest-related charges because the Lewis County grand jury that indicted him and the jury panel from which his trial jury was selected failed to contain the names of members of a local group known as "The Farm," and, further, because the proof showed that no members of The Farm had been included on the master jury list in Lewis County since 1975. The defendant contends that jury selection procedures in Lewis County resulted in the systematic exclusion of an identifiable group in the community, in violation of his rights under the Equal Protection Clause of the Fourteenth Amendment. We agree, and we also hold that the facts of this case demonstrate a violation of the defendant's rights under the Fourteenth Amendment's Due Process Clause and the Sixth Amendment to be indicted and tried by a jury reflecting a fair cross-section of the community.

As early as 1880, the United States Supreme Court recognized that trial by a jury from which members of a racial group have been excluded violates the right of an accused to the equal protection of law where the defendant is a member of the excluded group. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880). Gradually this rule was expanded to apply not only to discriminatory qualifying statutes, but also to the discriminatory administration of a qualifying statute otherwise fair on its face, *Neal v. Delaware*, 103 U.S. 370, 26 L.Ed. 567 (1881); to groups excluded on bases other than race, *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); and to cases in which the defendant is not a member of the excluded group, *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Thus the courts have recognized that it is "part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community," and that for "discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it [footnote omitted], but is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940).

Of course, the courts have also recognized that

. . . [in requiring that] juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition [citations omitted]; but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof. *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975)

■ The Tennessee jury selection statute is not facially discriminatory. *See generally Carter v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). It requires the appointment of a board of three jury commissioners in each county, T.C.A. § 22–223, who are to meet at fixed times to "select, from the tax records and the permanent registration records of the county, or other available and reliable sources, a list of names of upright and intelligent persons known for their integrity, fair character and sound judgment who are otherwise legally qualified to serve as jurors from each district in the county and in proportion to the population of such districts . . . ." T.C.A. §§ 22–228(a). The names on this list are then placed in a box, from which names of those summoned to petit jury service are drawn. T.C.A. § 22–228(b). Grand jurors are selected from the same list. Tennessee Rules of Criminal Procedure, Rule 6(a).

Despite the fact that the statutory scheme itself contains no inherently discriminatory provisions that would account for the exclusion of Farm members in this case, defense counsel insists that the administration of the jury selection statutes in Lewis County produced a constitutionally impermissible jury list and that upon his timely motion the indictments against his client should have been dismissed and the jury venire should have been quashed.

## I. The Defendant's Burden

■ Under the Sixth Amendment and the Due Process Clause, "juries [1] must be drawn from a source fairly representative of the community." *Taylor v. Louisiana,*

*supra,* 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690; see also *Alexander v. Louisiana*, 405 U.S. 625, 634–44, 92 S.Ct. 1221, 1227–32, 31 L.Ed.2d 536 (1972) (Douglas, J., concurring). It is this constitutional standard of cross-sectionalism that the defendant contends has been violated here. In *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the United States Supreme Court summarized the three-part test which has developed from a long line of cases beginning with *Strauder v. West Virginia, supra* :

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process.

See also *Castaneda v. Partida*, 430 U.S. 482, 494–95, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). We thus turn to an application of this test to the record before us.

## A. Cognizability: The Existence of a "Distinctive Group"

This is not the first time that the courts of Tennessee have been called upon to review the nature and origin of the religious commune known as The Farm. In *Gaskin v. State*, 490 S.W.2d 521 (Tenn.1973), our Supreme Court described the background and formation of the group as follows:

> Stephen Gaskin is the leader and teacher of a party of followers that in August

---

1. Essentially the same rules apply to both grand and petit juries. *See Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972).

 The State correctly points out that the defendant in this case cannot attack the composition of the grand jury on the basis of the Equal Protection clause, because he is not a member of the excluded class or group. Nor does the Sixth Amendment's fair-cross-section requirement apply to the grand jury. Moreover, it is true that the Grand Jury requirement of the

Fifth Amendment has never been applied to the States through the operation of the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed.2d 232 (1884). However, the law is equally clear that "[o]nce the State chooses to provide grand and petit juries, whether or not constitutionally required to do so [footnote omitted], it must hew to federal constitutional criteria . . . ." *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 330, 90 S.Ct. 518, 523, 24 L.Ed.2d 549 (1970).

of 1971 numbered from 350 to 360 persons according to his testimony. They left San Francisco on October 12, 1970, in a caravan composed largely, if not entirely, of buses. They spent the winter making their way across the country toward Tennessee. Gaskin had given religious lectures in San Francisco for several years and from time to time as the caravan moved eastward he gave lectures at various educational institutions. He had been a teacher of English and creative writing at San Francisco State College.

Upon their arrival in Middle Tennessee the party at first camped on land of the United States Corps of Engineers, near Donelson. They moved to Lewis County to a tract owned by a Mrs. Martin of Nashville who allowed them to use it. They spent the summer of 1971 on this property.

While they were on the Martin land in Lewis County local and state officers found marihuana plants under cultivation on the property. On August 31, 1971, they made a raid, cut and confiscated the marihuana and arrested Gaskin and the other defendants, who were members of a committee having charge of the production of marihuana. The trial and convictions resulted from this raid.

The defendant, Gaskin, testified that most of his adult followers used marihuana in their religious practices. He said:

> "Well we found that its a way to meditation that helps us to pray and to understand our Creator and also it helps us to see the truth in our personal problems and in our interactions with each other and that when we have prayer we try to get as high as we can so that we all can have the best vision we can so we can see what's going on; its a meditation thing, its well substantiated by people in religion that the experience that you can have with marihuana is identical to the religious experience that you can have spontaneously without it."

490 S.W.2d at 523.

Gaskin's conviction for the manufacture of marijuana was upheld by the Court, but despite this difficulty with the law, Gaskin's Farm continued to attract members, to prosper, and to grow in both geographical size and numbers. By the time of this trial, approximately 1,100 people were living at The Farm near Summertown, Tennessee, including almost 700 adults. According to undisputed testimony at trial, approximately 80% of the adult members have high school degrees, many are college graduates, two are medical doctors (several others being enrolled in medical school), approximately four hold Ph.D. degrees, and two are law school graduates, one of these being admitted to practice in Tennessee.

The Farm was described by one of its members at a trial as a "church" or a "monastery," and, indeed, it appears that the group can best be described as a religious community of people dedicated to a common set of spiritual beliefs.[2] The Farm is substantially autonomous, in that it is agriculturally self-sufficient and maintains its own school for the education of Farm children. The Farm also controls the ingress and egress of all outsiders, as well as that of its own members. In this sense, the group is somewhat self-segregated from the mainstream of Lewis County life.

Nevertheless, the proof shows and the trial judge found that many Farm members work outside the commune in construction and mechanical jobs (as well as pursuing other educational and vocational interests) for which they are compensated as regular wage earners. Members of The Farm also do business in the general community and, most significantly, more than half of those eligible are registered to vote in Lewis County. Presumably they also pay county taxes on their collectively owned property.

The trial court specifically held that the residents of The Farm constitute a distinct class or group within Lewis County, finding that

**2.** A Farm member testified that "we have fourteen other communities in the United States, and some other countries, so altogether in

our—as a body, we consider ourselves a church, and altogether, there's probably about 1800 of us [worldwide]."

. . . there does exist in Lewis County a group known—a socio-economic religious group, known as The Farm—and that these individuals collectively own property, pursue certain economic pursuits and vote. Perhaps in about the same proportion that is the citizenry at large.

But despite his finding that The Farm constituted a distinct socio-economic and religious group, the trial judge held that the members of The Farm had "walled themselves away from the mainstream of socioeconomic political structure and activity of Lewis County and Middle Tennessee," and thus were not part of a "viable or even a prima facie cross section of Lewis County." The trial judge then deduced from this finding that there had been no systematic exclusion in the selection of the jury panels from which this defendant's grand and petit juries were drawn.

The State concedes on appeal that members of The Farm constitute a "distinct" group for purposes of *Hernandez v. Texas, supra,* and *Duren v. Missouri, supra.* In *Hernandez* the United States Supreme Court noted:

> Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written ·or as applied, single out that class for different treatment not

based on some reasonable classification, the guarantees of the Constitution have been violated.

347 U.S. at 478, 74 S.Ct. at 670.

■ The court in *United States v. Guzman,* 337 F.Supp. 140, 143–44 (S.D.N.Y.), aff'd 468 F.2d 1245 (2d Cir. 1972), cert. denied 410 U.S. 937, 93 S.Ct. 1397, 35 L.Ed.2d 602 (1973), set out three factors to be considered in determining cognizability: (1) the presence of some quality or attribute which defines and limits the group; (2) a cohesiveness of attitudes or ideas or experience which distinguishes the group from the general social milieu; and (3) a community of interests which may not be represented by other segments of society. See also *United States v. Test,* 399 F.Supp. 683, 688–90 (D.Colo.1975).

■ Based on the holding in *Hernandez* and utilizing the criteria set out in *Guzman,* which we here adopt, we find that The Farm constitutes a "distinct" group for purposes of the rule in *Duren v. Missouri, supra.* We further hold that the trial court's determination that members of the group could be omitted from Lewis County jury lists because the group had "walled themselves away" is not "based on some reasonable classification,' as required by *Hernandez, supra,* 347 U.S. at 478, 74 S.Ct. at 670. Cf. *Turner v. Fouche, supra,* 396 U.S. at 362–64, 90 S.Ct. at 541–42.

### B. Representation on the Venire

■ The second requirement placed on the defendant in establishing a prima facie case is proof that the representation of the group on the jury panel is not fair and reasonable in relation to the number of such persons in the community.[3] The State con-

---

**3.** Under the "rule of exclusion," if the accused can show the long-term total exclusion of a cognizable group from the venire, the burden shifts to the State to demonstrate that the exclusion is not the result of invidious, purposeful discrimination against the group. See, e. g., *Norris v. Alabama,* 294 U.S. 587, 590-99, 55 S.Ct. 579, 580-84, 79 L.Ed. 1074 (1935) (blacks represented 7.5% of the eligible population, but none had been called in the previous 24 years);

*Hill v. Texas,* 316 U.S. 400, 403 -04, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559 (1942) (blacks represented 14% of the eligible population, but none had ever been summoned to grand jury duty). However, where long-term total exclusion has not been the case, the courts have been reluctant to find the existence of a prima facie case based on statistics alone, instead requiring proof of a substantial disparity coupled with systematic exclusion. Proof of systematic ex-

cedes that the evidence shows that "members of The Farm have been absolutely excluded from the [Lewis County] jury venires for the five years preceding the trial in this case."

The proof in the record indicates that Lewis County is a rural county consisting of nine civil districts. The Farm is located in the southeastern portion of the county, near Summertown, Tennessee, on a tract of land consisting of 1,700 acres situated in the first civil district of Lewis County. This district is the second most populous in the county.

The Farm's total population of 1,062 persons constituted approximately 12.2% of the 1978 population of Lewis County, which was estimated by the United States Department of Commerce Current Population Report (August 1979, Table 1) at 8,700 persons. At the time of trial there were 4,787 registered voters in Lewis County, of which 632 resided in the first civil district where The Farm is located; 324 residents of the farm were registered to vote, constituting about 6.8% of the total registration for Lewis County and over 50% of those registered from the first civil district.

The evidence further revealed that from 1972 (when The Farm was first established with a population of approximately 250 persons) until 1975, as many as 25 persons from The Farm were summoned for jury service. However, a new jury commission was appointed in 1975 and from that time until the trial in May 1979, no resident of The Farm

was called for jury service in Lewis County. (Although one Farm name was drawn from the box during the four year period, that person was rejected even though there was no evidence to show that the individual was statutorily disqualified or unfit for jury service. See discussion in Subsection C, *infra*.)

■ There can be no question that the statistics in this case establish a substantial underrepresentation of Farm members on the jury venires of Lewis County, for purposes of demonstrating a violation of the fair-cross-section requirement. Indeed, the figures show an absolute exclusion of the group, as the State concedes. Given the discrepancy between the proportion of the group in the total population (6.8%) and the proportion called to serve as jurors over a significant period of time (0%), we note, as did the court in *Castaneda v. Partida* that when such a "disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that . . . [group]-related factors entered into the selection process."[4] 430 U.S. at 494, fn. 13, 97 S.Ct. at 1280, fn. 13.

### C. Systematic Exclusion and the Selection Process

■ The third prong of the defendant's burden in proving a cross-sectional violation is a showing that the underrepresentation of the group on the jury panel was the result of "systematic exclusion" in the jury-

clusion often takes the form of evidence of an opportunity in the selection procedure for discriminatory conduct calculated to produce a disparity. *See, e. g., Alexander v. Louisiana*, 405 U.S. 625, 530–31, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972) (66.6% underrepresentation; culling by questionnaire with visible racial designations); *Turner v. Fouche*, 396 U.S. 346, 359–60, 90 S.Ct. 532, 539–40, 24 L.Ed.2d 567 (1970) (38% underrepresentation; disparity occurred at the point at which subjective standards were applied); *Whitus v. Georgia*, 385 U.S. 545, 548–50, 87 S.Ct. 643, 645–46, 17 L.Ed.2d 599 (1967) (74% underrepresentation; maintenance of separate lists of black and white taxpayers from which jurors were selected); *Avery v. Georgia*, 345 U.S. 559, 560–63, 73 S.Ct. 891, 892–93, 97 L.Ed. 1244 (1953) (64% underrepresentation; color of slips carrying names of eligible jurors differed for blacks and

whites); *Cassell v. Texas*, 339 U.S. 282, 284–90, 70 S.Ct. 629, 630–33, 94 L.Ed. 839 (1950) (74% underrepresentation; white commissioners, while disavowing personal acquaintance with blacks, failed to go out into the community in order to so familiarize themselves).

4. *See also United States v. Hyde*, 448 F.2d 815, 825 (5th Cir. 1971), *cert. denied* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), in which the court noted that "[w]hen there is a complete absence or 'spectacular' underrepresentation of Negroes on juries, the courts have read the figures as establishing a prima facie case of purposeful discrimination on the theory that discrimination . . . is the most reasonable explanation for the composition of the jury system under scrutiny (footnote omitted)."

selection process. As in *Duren v. Missouri*, that requirement has been met by proof that the statistical disparity in this case occurred not just occasionally but in every venire for a period of at least four years.[5] Such evidence "manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection system utilized." *Duren v. Missouri, supra*, 439 U.S. at 366, 99 S.Ct. at 669.

Furthermore, the evidence before us gives a clear picture of just how the Lewis County jury-selection system operated to exclude members of The Farm. In reviewing the record, we find that the most significant point brought out by the defendant's proof, as summarized below, is the fact that jury selection in Lewis County routinely is not carried out in conformity with applicable statutory provisions. See T.C.A. § 22–228, discussed *supra*. It is apparent to us that the failure of the trial court and the jury commissioners to follow the dictates of the jury selection statute is primarily responsible for the constitutionally improper juries impanelled in Lewis County during the period under discussion.

Two of the three Lewis County jury commissioners,[6] called by the defense, testified that in adherence to instructions from the trial judge, they placed on the master jury roll only the names of those persons with whom they were personally acquainted and whom they knew to be "of good character, [with] no criminal record, no young children, and non-dairy farmers." They did not use as their initial source the county registration rolls required by § 22–228. Instead, as one commissioner put it, he would merely suggest names of "people that I know, people I see on the street . . . [whose] names I jot down." He testified that he did not use the voter lists, but relied instead on the telephone book and personal recollection of people who "in my estimation [are] fit to

be juror[s]." The other commissioner who testified said that "because I was formerly the Election Commissioner and I knew a lot of people that way, and knew quite a bit about them . . . I select mine by knowing as many people as I do. *I have to know something* . . . about each person (emphasis supplied)." This witness testified that although the name of a Farm member was once drawn from the master list, he was rejected for jury service "because we didn't know anything about him."

Both commissioners denied that they had "systematically excluded" members of The Farm. We acknowledge that their testimony fails to reveal any malicious intent in omitting names of Farm members from the county jury rosters. However, as pointed out above, the legal effect of their action was the systematic exclusion of a distinct class in the community which constituted a significant proportion of the county population and over half the population of the second most populous civil district. This occurred despite the requirement of the statute that jurors be selected "in proportion to the population of [each district in the county]." T.C.A. § 22–228(a). Moreover, the courts have repeatedly held that "affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972). See also *Turner v. Fouche*, 396 U.S. 346, 361, 90 S.Ct. 532, 540, 24 L.Ed.2d 567 (1970); *Jones v. Georgia*, 389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25 (1967); *Sims v. Georgia*, 389 U.S. 404, 407, 88 S.Ct. 523, 525, 19 L.Ed.2d 634 (1967); *Whitus v. Georgia*, 385 U.S. 545, 551, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967).

It appears that the systematic exclusion of Farm residents in this case is largely attributable to a misinterpretation of the language in T.C.A. § 22–228(a), requiring

---

5. The "distinct" group under discussion in *Duren* was women, and the proof showed a disparity between the number of women in the population (54%) and those summoned for service (26.7%) continuing over a period of "nearly a year." 439 U.S. at 366 68, 99 S.Ct. at 669- 70.

6. The third commissioner was ill and unable to attend court.

the compilation of "a list of names of upright and intelligent persons *known* for their integrity, fair character and sound judgment . . . (emphasis supplied)." The trial judge and the jury commissioners apparently took this to mean that only those *known to the jury commissioners personally* to have such characteristics were eligible for jury service. Claiming that they were personally acquainted with no residents of The Farm commune, the jury commissioners thus failed to enroll the names of any members of that group or to summon them for jury service. The result, as previously noted, was the total exclusion of Farm residents from the jury lists.

Selection based solely on personal acquaintance was specifically invalidated in *Smith v. Texas, supra.* In that case, as here, the jury commissioners

> . . . categorically denied that they intentionally, arbitrarily or systematically discriminated against negro jurors as such. One said that their failure to select negroes was because they did not know the names of any who were qualified and the other said that he was not personally acquainted with any member of the negro race.
>
> \*　\*　\*　\*　\*　\*
>
> Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no negroes as well as from commissioners who know but eliminate them. If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand.

311 U.S. at 131–32, 61 S.Ct. at 166. *See also Whitus v. Georgia, supra,* 385 U.S. at 549–52, 87 S.Ct. at 646–47.

In *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), the State ascribed the underinclusion of blacks on the county grand juries to the jury commissioners' lack of personal acquaintanceship with black citizens in the area. Rejecting this reason as justification for the failure to summon blacks to serve on the grand jury, the United States Supreme Court held that "[w]hen the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county . . .." 339 U.S. at 289, 70 S.Ct. at 633. Thus the trial court in this case erred in holding that "[i]f and when the members of The Farm allow themselves to participate more broadly in the socioeconomic political religious aspects of Lewis County . . ., the jury commissioners will be picking up more of their names and will be seating them in the jury box." As can be seen from *Cassell,* this ruling improperly places the burden of ensuring a cross-sectional representation on the prospective jurors rather than on the officials whose sworn duty it is to compile jury lists representative of the entire community.

There can be no doubt that the exclusion in this case was purposeful. Moreover, as the cases cited above indicate, the reason for the exclusion was not valid, and its effect was "systematic," as that term is used for purposes of the Sixth and Fourteenth Amendments.

■ The record shows unequivocally that the defendant satisfied the tripartite burden of proving that an identifiable group in the community has been substantially underrepresented (indeed, in this case wholly excluded) from the Lewis County jury venires, and that this underrepresentation is the result of systematic exclusion in the jury selection process. He thus established prima facie that the State violated his rights under the Sixth and Fourteenth Amendments. *Duren v. Missouri, supra.*

## II. The State's Burden

■ Once the defendant has made out a prima facie case, the burden shifts to the State to rebut the presumption of unconstitutional action. In this regard, "[t]he right to a proper jury cannot be overcome on merely rational grounds . . .," but "requires that a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process, such as the exemption criteria, that result in the

disproportionate exclusion of a distinctive group." *Duren v. Missouri, supra*, 439 U.S. at 367–68, 99 S.Ct. at 670. Here the State not only failed to offer proof establishing a "significant state interest" in excluding members of The Farm, but the prosecution offered no proof whatever, and, in fact, did not even make a responsive argument at the conclusion of the defendant's proof. Thus the conclusion is inescapable that the State totally failed to carry its burden in this case, and that the defendant's motions to dismiss the indictments and quash the jury venire should have been granted.

 Nor do we see any possibility from the record that the defendant's case could have been successfully rebutted by the State. Moreover, we note that utilization of wholly subjective criteria in a selection process such as Tennessee's will invite a challenge to the array whenever it appears to produce jury venires that are not representative of the community at large. *See generally Avery v. Georgia*, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953). This problem could be avoided by utilization of a random selection or "key number" system, which is in use in many areas of Tennessee, as well as most other states and the federal system. *See, e. g., Castaneda v. Partida, supra*, 430 U.S. at 497, fn. 18, 97 S.Ct. at 1282, fn. 18; *Mitchell v. Rose*, 570 F.2d 129, 134, fn. 5 (6th Cir. 1978). Use of a "key number" applied to county registration lists which are reflective of a cross-section of the community may occasionally produce a venire which appears to underrepresent some identifiable group in the community.[7]

However, when an objective selection criterion of this nature is used, such an underrepresentation can be shown to be the result of mischance rather than the deliberate, *systematic* exclusion of any group. Of course, once a cross-sectionally fair master list is compiled, the jury commissioners are free to delete the names of those persons who are known to be disqualified to serve under T.C.A. § 22–102 or unqualified under § 22–228(a), as long as such deletions do not result in the exclusion of a "distinct" group in the community. *Carter v. Jury Commission of Greene County, supra.*

III. Qualification of the Minor Witnesses

 Because the convictions in this case must be reversed and the indictments dismissed, we see little need to engage in a lengthy analysis of the errors alleged to have transpired at the defendant's trial. However, in the event the defendant is reindicted by a properly constituted grand jury and brought to trial, it is apparent that the two children who testified against him at the trial in this case will again be called to testify. We therefore deem it appropriate to point out that these two witnesses were not fully and properly qualified by the trial judge. Each of the two children told the court that she knew the difference between telling the truth and telling a lie. However, T.C.A. § 24–101 requires that a witness "understand the obligation of an oath," which may be different from merely acknowledging the difference between a truth and a falsehood. Under Tennessee law, only "a child who has a due sense of

---

7. As the State notes in its brief:

Using a random selection method would have produced striking results when compared to the results obtained by the system used in Lewis County. First, using total population figures (*see Castaneda v. Partida*, 430 U.S. 482, 494, [97 S.Ct. 1272, 1280, 51 L.Ed.2d 498] (1977)), the proportion of members of The Farm to the total population of Lewis County is approximately 12.2 per cent. Of the 1,125 names drawn from the jury box from 1975 to the present (see Exhibit 1 to Motion to Quash Array) a random selection would have resulted in approximately 137 persons summoned from The Farm. Even using the voter registration list, assuming the 4,787 persons are still eligible to vote, members of The Farm comprise approximately 6.8 per cent of the total persons on this list. A random selection from the voter registration list from 1975 to the present would have resulted in approximately 76.5 persons summoned from The Farm. The probability that zero persons from The Farm would be summoned from 1,125 random draws from the voter registration list would be only $3.90 \times 10^{-35}$ or .0000000000000000000000000000000000390. See Finkelstein, *The Application of Statistical Decision Theory to Jury Discrimination Cases*, 80 Harv.L.Rev. 338, 353–365 (1966).

the obligation and sanctity of an oath, who understands the evil of lying and that such wrongdoing is punishable, or who, having sufficient natural intelligence, has been so instructed as to comprehend the nature of the act of telling the truth and the consequences of a wilful falsehood, may properly be admitted to testify." *Ball v. State*, 188 Tenn. 255, 219 S.W.2d 166, 168 (1949). The record before us fails to establish such an understanding on the part of the two minor witnesses in this case.

 In addition, the competency of a witness to testify is a matter which must be determined by the trial judge. *Arterburn v. State*, 216 Tenn. 240, 391 S.W.2d 648, 657 (1965). It appears that the trial judge here erroneously abdicated his responsibility when he instructed the jury, "I am not telling you how to take the testimony. . . I am just saying that they are young ladies and they will be given an oath, and I am just simply telling you that . . . they may not understand the full, complete meaning of the oath." If a trial judge determines initially that a witness does not understand the meaning of the oath, the witness must be ruled incompetent to testify; a contrary result would amount to an abuse of discretion and reversible error. *Ball v. State, supra; Bright v. State*, 191 Tenn. 249, 232 S.W.2d 53, 56 (1950).

The State in an excellent brief of the law has conceded that the defendant's Sixth and Fourteenth Amendment rights have been violated in this case. The record amply supports this conclusion. For the reasons set out above, the judgment of the trial court is reversed and the case is remanded to the trial court for the entry of orders consistent with this opinion.

DUNCAN and TATUM, JJ., concur.