IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 4, 2009

## STATE OF TENNESSEE v. ATAVIS CORTEZ CUNNINGHAM

**Direct Appeal from the Circuit Court for Dyer County**
**No. 08-CR-227    Lee Moore, Judge**

**No. W2009-00744-CCA-R3-CD  - Filed September 16, 2009**

The defendant, Atavis Cortez Cunningham, was convicted by a Dyer County Circuit Court jury of aggravated assault, a Class C felony, and sentenced to eight years as a Range II offender.  On appeal, he argues that the jury was unconstitutionally empaneled and the evidence was insufficient to support his conviction.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Danny H. Goodman, Jr., Tiptonville, Tennessee (on appeal); and Barbara A. Deere, Dyersburg, Tennessee (at trial), for the appellant, Atavis Cortez Cunningham.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; C. Phillip Bivens, District Attorney General; and Renee Creasy, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was indicted on one count of aggravated assault arising out of his involvement in an altercation with the victim, Philip Graff, on the evening of April 12, 2008.

**State's Proof**

Derendia Redden testified that on April 12, 2008, she was living in Dyer County with her boyfriend, Kelvin Flatt, and a friend, Michelle Hatch.  On that date, the defendant and a woman named Kendra Pierce were visiting at Redden's house and everyone was planning "to go out."  While Redden visited with the defendant and Pierce, Flatt was in bed asleep and Hatch was in the bathroom.  At some point, the defendant called the victim and asked him to come over and give him

a ride. However, after getting off the phone, the defendant explained that he was actually going to steal the victim's laptop computer and then "beat his ass." The defendant related that he was angry with the victim because the victim had told the police that the defendant "had a failure to appear."

The victim arrived approximately fifteen to thirty minutes after the defendant called him. Redden opened the door and told the victim that he was not welcome there because of problems with Flatt and the victim in the past. However, the victim pushed the door in, and the two of them proceeded to "ha[ve] stuff to say." By this point, someone woke Flatt, and he and the victim started "hollering at each other" about the victim's coming into the house. The altercation moved outside and involved "a little tugging and a little swing-around," and then Flatt twisted the victim around causing him to fall to the ground. Redden said that she was able to see the entire fight and did not see any blood from either party. She described the altercation as more of a "scuffl[e]" than a fight.

Redden testified that Flatt hit the victim once and the victim fell to the ground. She recalled that the defendant was walking around both men, and the victim said to him, "Help me, Dog, help me." At that point, the defendant punched the victim in the face, and Flatt said, "No, dude, this is my fight. No, no." However, the defendant started to kick the victim in the ribs. Flatt laid down on top of the victim, but the defendant continued to kick the victim while trying to lift up Flatt. Flatt got up and tried "to get [the defendant] away," but the defendant continued to kick the victim in the ribs then kicked him in the face two or three times. After the kicking stopped, Redden saw a lot of blood on the victim. She expressed that she had "never seen a fight like that."

Redden testified that she heard the victim say, "I want to know why, I want to know why," and heard the defendant say, "I told you I was going to do this because you told the police on me. You told them I had a [failure to appear]." She said that was the only thing she heard the defendant say to the victim during or after the fight.

Kelvin Flatt testified that at the time of the incident, he had been friends with the defendant for approximately five years and had only known the victim, with whom he had recently had an argument, for a couple of months. On the night in question, Flatt was asleep in bed when he heard "screaming and yelling" and got up to see what was going on. In the living room, Flatt saw the victim standing in the doorway and told him that he needed to leave. The two "started cussing and . . . started fighting, and then . . . made it to the yard, and then [the victim] g[a]ve up." Flatt elaborated that after they got outside the house, he punched the victim about three times but stopped once the victim was on the ground and no longer putting up a fight.

Flatt testified that he was lying on top of the victim and preparing to get up when the defendant came up and punched the victim. As he punched the victim, the defendant said, "You know why I'm whipping your ass[?]" Flatt told the defendant that he needed to stop, but the defendant "reared back like he was going to kick him, so [Flatt] put [his] arm in front of [the victim's] head and leaned down close to him[.]" The defendant kicked the victim in the ribs and also kicked Flatt, so Flatt got up. The defendant then started "stomping [the victim] in the face," and Flatt tried to get him to stop because "he was really going to hurt the [victim]." When the defendant

stopped, the victim got up, ran to his car, and drove off. Flatt said that he told the defendant, "Man, that's messed up. You shouldn't have done him like that" because he almost killed the victim.

Flatt testified that the victim was bleeding and, from a distance, appeared to be covered in blood. However, he only thought the victim "was just banged up a little bit" because he was able to drive. About three weeks later, Flatt went to visit the victim and noticed that "[h]is head was swol[len] up like a pumpkin" and he had a scar down one side of his jaw.

The victim testified that he received a call from the defendant around 6:30 p.m. on April 12, 2008. The defendant told the victim that he was getting ready to go to a nightclub, and the victim asked if he needed a ride. The victim asked the defendant if Flatt was at the house, and the defendant responded that Michelle Hatch was at the house but did not mention anyone else being there. When he arrived at the house, he was met at the door by Redden who told him he was not welcome there. The victim said that he was outside waiting on the porch for the defendant, when Flatt came outside and they started fighting. He explained that Flatt punched him and followed him off the porch, at which point Flatt "grabbed [him] by the left sleeve of [his] leather jacket and [they] started going in circles." He recalled that he "came out of [his] leather jacket and [they] tied up again. That's when [they] went to the ground."

The victim stated that while he and Flatt were on the ground, he saw the defendant on the porch and yelled for him to help. Instead, the defendant punched and kicked him. He recalled that "the first blow . . . felt like somebody had taken [his] head and just slammed it down on the concrete." A few blows later, he felt as if his teeth had been knocked out. He remembered getting kicked in the ribs and in the face once or twice, but "after that, everything was just a blur." He did not remember getting in his car or driving to a gas station. He walked into the gas station and passed out. The store clerks called the police, and he was taken by ambulance to the local hospital where they "determined that they didn't have the resources and capabilities to help [him]." He was then transported by ambulance to the Regional Medical Center ("the Med") in Memphis.

The victim testified that he could not swallow on his own and had to have a tube placed in his mouth. His mouth and throat would not stop bleeding, and he "was in continuous pain." He could not move his mouth and underwent surgery the next day. The victim noted that he sustained four breaks and three fractures to his jaw and had to have a permanent steel plate placed in his jaw. He displayed his surgical scar to the jury. He recalled that the doctors wired his jaws shut, and he was told they would have to remain wired for three to four weeks. However, he removed the wires himself about three hours after leaving the hospital because he became nauseated. The doctors told him that his injuries would cause him problems for the rest of his life. In fact, the week before trial, he had to see a doctor again because his jaw "popped out of place."

The victim testified that he had known the defendant for four and a half years and had no idea the defendant was angry with him. He noted that, the previous week, the defendant had been arrested for a failure to appear, but "[o]ther than that, there's never been any bad blood between [them]." On cross-examination, the victim said that he was certain that Flatt was not the one who

injured his jaw. On redirect, the victim stated that there was no doubt in his mind that the defendant kicked him in the face.

**Defendant's Proof**

Deputy Bill French of the Dyer County Sheriff's Department testified that he reported to the All-In-One gas station in response to an injured person call on April 12, 2008. At the scene, Deputy French saw the victim with "blood all over his face . . . [and] pretty good cuts on his face." After the victim was taken to the hospital, Deputy French interviewed him and later interviewed the witnesses from the residence.

Michelle Hatch testified that she did not witness the altercation in this case because she was in the shower when the fights occurred. However, she got out of the shower in time to look out the front door and see the victim run from the end of the driveway to the middle of the street. She noted that "he was all bleeding and his face was all messed up." She observed that the victim's jaw "was just hanging there." Hatch recalled that "when [she] went to the street to see how [the victim] was doing, h[e] and [the defendant] were yelling back and forth[,]" then the victim left.

Kendra Pierce testified that she witnessed the fight between Flatt and the victim and noted that the victim entered the house and the fight started inside. She elaborated that the victim "worked his way into the house, [Flatt] was woke up, and they had words, and then an altercation started." She said that the victim threw the first punch and then the fight moved outside. At some point during the fight, the victim fell to the ground and started yelling for the defendant to help him. The defendant "r[a]n past everybody . . . [and] immediately started stomping [the victim]." Pierce saw the defendant kick the victim in the ribs and head. She noted that the victim "was bleeding really bad." Before the victim left, he "holler[ed] from the road, wanting to know . . . why [the defendant] stomped him like he did, and [the defendant] c[a]me outside, and he said, . . . 'You want to know why I whipped you?' He said, 'Because you put me in jail.'" Pierce recalled that the defendant had earlier called the victim and asked him to come to the house. After the phone call, Pierce heard the defendant say that he planned to steal the victim's laptop computer and then "whip" the victim. The defendant related that he and the victim had had an altercation over his being pulled over by the police.

Following the conclusion of the proof, the jury convicted the defendant of aggravated assault as charged.

## ANALYSIS

### I. Jury

The defendant argues that the jury was unconstitutionally empaneled in that it consisted entirely of Caucasians and only one African-American was in the jury venire.

We initially note that a transcript of the jury selection process was not included in the record before us; therefore, we are unable to ascertain whether the defendant raised the issue at trial. From the trial court's findings at the motion for new trial hearing, we glean that he did not. We also note that the defendant failed to include this allegation in his written motion for a new trial. Instead, at the hearing on the motion, the defendant sought to orally amend the motion to include the claim that the jury venire contained only one potential African-American juror. The trial court allowed the defendant to amend the motion over the State's objection. Thereafter, the defendant did not offer any proof on the issue and failed to reduce the oral amendment to writing within thirty days of entry of the order of sentence, thus waiving the issue. See Tenn. R. Crim. P. 33(b); State v. Ronnie Watson, No. W2001-03084-CCA-R3-CD, 2002 WL 31258011, at *2 (Tenn. Crim. App. Sept. 16, 2002); State v. Christopher D. Lanier, No. W2001-00379-CCA-R3-CD, 2002 WL 1482712, at *4 (Tenn. Crim. App. Feb. 1, 2002).

Waiver notwithstanding, in ruling on this issue at the motion for new trial, the trial court found as follows:

> [T]he whole jury panel is randomly selected through a computer system by three jury commissioners, one of whom is an African American. The Grand Jury Foreman in this county is an African American. I don't know who all was on the jury panel but there was no issue raised about that at the time and when we select the jury from the jury panel it is also done randomly. I have no control over that. I draw the names out of the hat, . . . and I do that in the presence of everybody in the courtroom and I don't see that as a basis for a new trial.

The court elaborated in its written order that "the selection of the jury was random and unbiased, and further, the only potential juror of African-American descent advised the Court he could not be impartial and was excused by the Court[.]"

In order to establish a prima facie violation of his right to have a jury that is selected from a fair cross-section of the community, the defendant must show:

> "(1) that the group alleged to be excluded is a 'distinctive' group in the community;
>
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
> (3) that this under[-]representation is due to the systematic exclusion of the group in the jury-selection process."

State v. Nelson, 603 S.W.2d 158, 161 (Tenn. Crim. App. 1980) (quoting Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979)). One does not have a constitutional right to be tried by a jury wholly or partially composed of persons of his or her own race. Harvey v. State, 749 S.W.2d

478, 481 (Tenn. Crim. App. 1987); see also Wheeler v. State, 539 S.W.2d 812, 815 (Tenn. Crim. App. 1976). The bare fact that an African-American defendant was tried by a jury of Caucasian jurors does not violate any right. Harvey, 749 S.W.2d at 481.

As to the first prong, African-Americans clearly represent a distinctive group in the community. State v. Mann, 959 S.W.2d 503, 535 n.24 (Tenn. 1997). However, as to the other prongs, the defendant failed to offer any proof as to how the venire selection process was conducted or any evidence on the proportion of African-Americans in the population from which the venire was drawn. He simply argues that "[t]here were approximately 50 prospective jurors in the jury venire but only one African-American. Simple math shows that there should have been several African-Americans in the venire." The defendant moreover offered no proof that the under-representation of African-Americans on the venire from which his jury was drawn was due to a systematic exclusion of African-Americans. The defendant has failed to carry his burden; thus, this claim is without merit.

## II. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. Specifically, he asserts that there was insufficient proof that the victim sustained "serious bodily injury." When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted

defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [c]auses serious bodily injury to another[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A). "Serious bodily injury" is "bodily injury that involves: (A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; or (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Id. § 39-11-106(a)(34).

In the light most favorable to the State, the evidence shows that while engaged in a fight with Flatt, the victim sought the defendant's help, but the defendant instead kicked the victim repeatedly in the ribs and face. Previously that evening, the defendant had expressed his intentions of robbing the victim of his laptop computer and "whipping" him due to his belief that the victim had caused his arrest. Several eyewitnesses described that the defendant "stomped" or kicked the victim in the face. The victim recalled that "the first blow . . . felt like somebody had taken [his] head and just slammed it down on the concrete." A few blows later, he felt as if his teeth had been knocked out. He remembered getting kicked in the ribs and in the face once or twice, but "after that, everything was just a blur."

The victim was taken to the local hospital but had to be transported by ambulance to a hospital in Memphis due to the severity of his injuries. At the hospital, the victim "was in continuous pain" and had to have a tube placed in his mouth because he could not swallow on his own. It was discovered that he sustained four breaks and three fractures to his jaw, and he had to have a permanent steel plate placed in his jaw. He was told that his injuries would cause him problems for the rest of his life. In fact, the week before trial, he had to see a doctor again because his jaw popped out of place. He recalled that the doctors wired his jaws shut, and he was told they would have to remain wired for three to four weeks. However, he removed the wires himself about three hours after leaving the hospital because he became nauseated. Hatch noticed, after the incident, that the victim's jaw "was just hanging there." Flatt visited the victim three weeks after the altercation and noted that "[h]is head was swol[len] up like a pumpkin" and observed a scar down one side of his jaw.

We conclude that this evidence was sufficient for a rational trier of fact to find that the victim suffered "[p]rotracted or obvious disfigurement[.]" The jury heard of the medical treatment the victim had to undergo and viewed his scar. See State v. Shanda Alene Wright, No. M2006-02343-CCA-R3-CD, 2008 WL 371258, at *7 (Tenn. Crim. App. Feb. 11, 2008), perm. to appeal denied (Tenn. Oct. 27, 2008) (holding that scar on scalp and three-centimeter scar on forearm were sufficient to establish the element of serious bodily injury); State v. Anthony D. Forster, No. M2002-00008-CCA-R3-CD, 2003 WL 1715922, at *10 (Tenn. Crim. App. Apr. 1, 2003), perm. to appeal denied (Tenn. Oct. 13, 2003) (holding that scar from bridge of victim's nose to upper lip was sufficient for jury to find protracted or obvious disfigurement even where only medical treatment received by victim was application of a butterfly bandage). Moreover, we note that the distinction

between bodily injury and serious bodily injury is a question of fact for the jury to determine. <u>See</u> <u>State v. Barnes</u>, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). The evidence was sufficient to show that the victim suffered serious bodily injury.

## **CONCLUSION**

Based on the aforementioned authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE