**Richard G. GOTWALD,**
**Plaintiff–Appellant,**

v.

**Susan C. GOTWALD,**
**Defendant–Appellee.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Nov. 9, 1988.

Permission to Appeal Denied by Supreme Court March 27, 1989.

Anne Russell, (on appeal), Robert L. Jackson (trial), Nashville, for appellant.

Lewis Conner, Robert E. Boston, Nashville, for appellee.

## OPINION

TODD, Presiding Judge.

In this divorce case, the father, Richard G. Gotwald, has appealed from certain post-decree decisions of the Trial Court regarding custody, care and support of the infant child of the parties.

### Proceedings in the Trial Court

On November 14, 1983, the parties were divorced, custody of the 1 year old son of the parties was committed to the mother, and stated visitation was allowed the father who was ordered to pay $425 per month child support.

On May 24, 1985, the father filed a petition for injunction and change of custody on grounds of abuse of the child by the wife's intimate friend.

On the same date the Trial Court enjoined the mother and her intimate friend from interfering with the father's temporary custody of the child.

On May 28, 1985, the mother answered denying misconduct on the part of her intimate friend.

On September 10, 1985, the Trial Court restored custody to the mother under conditions excluding the intimate friend from association with the child and amended schedule of visitation with the father.

On March 10, 1986, the mother filed a "Counter Complaint", reciting a lengthy list of complaints against the husband and praying that she be restored to unrestrained custody, that the injunction against association with her intimate friend be lifted, that child support be increased, that the child advocate appointed by the

court be discharged and for attorney's fees.

On April 2, 1986, the father filed an "Amended and Supplemental Complaint for Change of Custody", alleging further abuse of the child by the mother.

On April 3, 1986, the father filed an "Amended Complaint Adding Additional Defendant," naming the intimate friend of the wife and seeking to enjoin him from being in the presence of the child.

On May 13, 1986, the mother answered the Amended and Supplemental Complaint denying the material averments thereof.

### The Evidence

The trial of this case consumed 9 weeks, involved 45 witnesses, and produced 7,375 pages of testimony. Obviously, any comprehensive summary of the evidence is impractical. The general substance of material evidence will be reviewed, in logical, but not chronological order in the record.

It is uncontroverted that, following the divorce in November, 1983, the father married his present wife whose first name is "Suzy", not to be confused with "Susan" his first wife and mother of the child. Also after the divorce, the mother established a social relationship with one Glenn Booth.

Dr. James McGeehee, a psychiatrist, testified without contradiction or objection that, prior to the divorce, he treated the father for "adjustment disorder" and "dysthymic disorder" arising out of loss of his wife's attention to the child and his affair with a girl friend.

The father testified to certain bruises on the child's body and statements of the child to him such as:

Glenn scares me

Mommy don't like you and I don't either.

Mommy said you're a drunk.

Glenn and Mommy pinch my fingers.

Glenn's not nice to me.

Don't take me to Mommy's.

Glenn pinched it (my ear).

Glenn pulls my hair.

Glenn punches me in my stomach.

The present wife of the father corroborated the testimony of the father.

Jo Larrimer, next door neighbor of the father, testified that the child made some of the above statements to her.

Meg Wade, a friend of the father, testified that she saw bruises and heard some of the above statements of the child.

The child advocate testified that the child made similar statements to her.

Charles Gentry, director of Family and Children's Services of Knoxville, Tennessee, testified that the father brought the child to him and that the child made statements similar to the above. However, Gentry also testified that the child told him he had not been hurt by Glenn or anybody.

Dr. Embry McKee, a psychiatrist, testified that the father brought the child to him on May 22, 1985, and that the child told him his hair had been pulled, his penis squeezed, his ear pulled, and his stomach hit, and that he had been whipped and "tinkled on" by "Glenn".

At Dr. McKee's direction, the child was taken by the father to Dr. Kent Kyger on May 24, 1985. Dr. Kyger testified that the child told him that Glenn was mean to him, hurt him, pinched him, burned him, put him in a closet and "pinched" his penis. Dr. Kyger further testified that he subsequently interviewed the mother and Booth and observed the child in Booth's presence and concluded that the child was suffering from anxiety caused by separation from his mother and that the statements of the child regarding abuse were untrue. The father asserts that the opinion of Dr. Kyger was strongly influenced by his discovery that Glenn Booth is a doctor.

Dr. Roland Summit a "sex abuse expert" criticized Dr. Kyger's methods and conclusions.

Carol Etherington, Director of Davidson County Victim Intervention Program, criticized Dr. Kyger's methods.

The child was interviewed on numerous occasions by employees of the Department of Human Services, the Police Department and the District Attorney General.

The mother, *Susan* Gotwald, testified that none of the alleged abuse occurred in her presence and there had been no opportunity for such to occur during the brief periods when Booth was alone with the child. The mother also testified that, immediately after the birth of the child, the father deserted her and the child and began living with his present wife, Suzy; that she sought reconciliation, but received only notes regarding oral sex, slinky negligees and X-rated movies.

Glenn Booth testified that there was no truth in the allegations of abuse.

Dr. Jill Chambers, the mother's obstetrician, testified of the behavior of the father after the birth of the child.

Dr. Vernon Sharp, a psychiatrist, testified that he had seen Booth 12 or 15 times and that he was not a sex abuser; also that he had seen the child once, but, in view of the many others interviewing the child, he terminated the interview in the best interest of the child. Dr. Sharp also testified that a child of the age of the subject child is "very malleable in terms of the power of suggestion," and "could be written on just like a blackboard."

Dr. Ralph Underwager, clinical psychologist, testified that he had reviewed the various interviews with the child and that they were improperly conducted and of no probative value.

Dr. Moisy Shopper, a child psychologist, testified that he had reviewed all of the interviews by various public employees and found them to be manipulative and non credible.

Dr. Lee Coleman, a child psychiatrist, also testified critically of the various investigatory interviews and approved the method of confrontation employed by Dr. Kyger. He also testified as to the ease with which a young child can be "programmed", as to the unreliability of the evidence acquired after suggestive questioning.

Dr. Emmett Dozier, child psychologist, testified as to the advisability of confrontation between child and accused abuser and the ease of "programming" a small child by a parent.

Dr. John Fields, pediatrician of the child since birth, testified he had never observed any evidence of abuse.

Dr. Joseph LaBarbera, a child psychologist who conducted psychological testing of the child in the summer of 1985, reported that the tests showed favorable attitudes toward the mother and Booth, and negative attitudes toward the father and Suzy. He also reported that the child told him that he accused Booth of abuse because Suzy told him to. He also reported that the I.Q. of the child had increased thereby negativing any "regression" from abuse.

Judson Bylar, director of the day care center where the child spent 5 days a week throughout 1985 and 1986, testified that he never observed any evidence of abuse and that the bruise on the child's thigh occurred on March 13, 1986, in a fall from the "monkey bar" at the day care center.

Three other employees of the day care center corroborated the testimony of the director.

*The Decision of the Trial Court*

On October 17, 1986, the Trial Court filed a 29 page memorandum disposing of the issues of (1) Credibility of Witnesses, (2) Abuse by intimate friend of wife, (3) Fitness of Parents, (4) Custody and Visitation, (6) Future Therapy, and (7) Conduct of Trial. Under the last mentioned topic, the Court wrote:

Lawyers for both parties have engaged in tactics which have greatly protracted the case and deepened the level of hostility. Such tactics cannot be condoned, and the Court's decision in this case is not to be interpreted as condonation of the tactics of either side. It is hoped that from now on, counsel can reduce the level of hostility and become instruments of peace rather than instruments of conflict.

The memorandum concluded:

The change in circumstances which has occurred since the November 1983 decree necessitates a modification in the father's visitation but do not justify a

change in custody. An appropriate order will be entered.

On October 17, 1986, the Trial Court entered an order leaving custody with the mother, modifying the schedule of visitation with the father and requiring an agreed plan of therapy to be filed by January 1, 1987.

On March 31, 1987, the Trial Court filed a memorandum setting a fee for the child advocate of $16,588, of which $12,092 had been paid by the parties and the remainder of which, with $450 expenses were taxed as part of the costs.

On the same date, the Trial Court filed a memorandum in which $125,000 was awarded to the wife for attorney's fee.

On the same date, the Trial Judge filed a memorandum increasing child support to $600 per month.

On the same date an order was entered implementing the three memoranda and taxing all costs to the husband.

On April 1, 1987, an order was entered dismissing the wife's petition for contempt filed on March 4, 1987.

On April 28, 1987, the Trial Court entered an order overruling the wife's motion to suspend or modify the judgment.

On April 23, 1987, the husband filed a notice of appeal "from the final judgment entered in this action on the 31st day of March, 1987".

### Removal of Child Advocate

■ The husband's first issue is whether the Trial Court erred in removing the child advocate.

On May 30, 1986, during the trial, the Trial Court entered the following order:

The Court has reconsidered the mother's motion to remove the Court appointed child advocate in light of the evidence produced in 5 days of trial and in the numerous depositions studied by the Court. It is apparent that the child advocate's continued involvement in this case will be a source of controversy which will continue to have an adverse impact on the child, as does all controversy between the parents. Her continued involvement complicates the case and is yet another diversion from what is to be the focus of the Court's inquiry. In addition, the child advocate's services has created a remarkable financial burden of the mother and possibly the father. Further, the child advocate has a good deal of ambivalence about her role in this case and even once resigned as the child advocate. Finally, the Court's pretrial suspicion that counsel for the parents will produce every conceivable fact which will be useful to the Court has been confirmed after 5 days of trial.

The Court has already noted that the child advocate's continued participation in this suit will be helpful to the Court. However, that help is outweighed by the above noted problems.

. . . .

The Court expresses thanks to the child advocate for sincere and dedicated work in this most difficult case.

IT IS, THEREFORE, ORDERED that the child advocate be discharged in this case.

The husband asserts that the presence of a child advocate was "mandatory", citing *Higgins v. Higgins*, Tenn.App.1981, 629 S.W.2d 20 and *Moon v. Moon*, Tenn.App. 1981, 621 S.W.2d 767. In *Higgins*, this Court reversed for failure to determine the competency of minor witnesses and remanded for a new trial. *Under the circumstances of that case*, it was held that the children should have the benefit of competent counsel. In the present case, the Trial Court did designate competent counsel for the minor, but as found by the Trial Judge (above), the parties and their counsel rendered impossible the beneficial participation of said counsel.

The statements of *Higgins* were written without anticipation that any set of parties and counsel would ever produce the situation described by the Trial Judge above.

In *Moon*, this Court vacated a custody order entered upon insufficient grounds and the cause was remanded for redetermination of custody. Under the circumstances of that case, this Court held that the

interests of the child should have been protected by court appointed counsel. Again, the expression was made in anticipation of correct conduct on the part of the parties and counsel.

It is possible that severe sanctions would have been a better solution to the problem than relieving the child advocate. However, this Court is not in position to so rule, not having endured the ordeal to which the Trial Judge and child advocate were subjected.

Moreover, in order to reverse the action of the Trial Judge in respect to the child advocate, it would be necessary for this Court to find that the interests of the child were prejudiced by that action and that a retrial of this cause with a child advocate would serve the best interests of the child. This Court is not in position to make such a finding.

Further, it is doubtful that a parent of a minor child has standing to complain of the discharge of a child advocate where the parent was in court with counsel professing to advocate the best interests of the child. It would be necessary for such a parent to satisfy this Court that the counsel of that parent was inadequately advocating the best interests of the child or that such counsel was advocating a decision contrary to the best interests of the child. Such a position is inconsistent with the professed attitude of every parent or parent's counsel in every child custody case heard and determined by the judges participating in this decision.

No merit is found in the appellant's first issue.

Appellant's second issue is as follows:

> Whether the Trial Court erred in refusing to recuse itself after the Court was improperly approached and/or after the Court became prejudiced against the father such that the Court could not fairly and impartially weigh the evidence presented.

It should be initially noted that this controversy originated in the Fourth Circuit Court of Davidson County where the Trial Judge recused herself. The case was transferred to the Probate Court of Davidson County. The Judge of that Court subsequently recused himself, and the case was transferred to Part III of the Chancery Court of Davidson County where it was tried to a conclusion. The issue refers to the Chancellor who presided over the trial and rendered the judgment under review. The Chancellor is designated the Trial Judge herein.

At the first hearing before the Trial judge, he announced that, prior to the transfer of the case from Probate court, he (the Trial Judge) had been contacted by a "third party" regarding a case similar to the present case. The Trial Judge disclosed the contents of the "contact" and stated that he had no predisposition as to the issues in this case. Both parties declined to object to the participation of the Trial Judge and agreed for him to continue. There is no evidence of the execution of a remittal of disqualification as provided in Supreme Court Rule 10, Canon 3 D, however, there is no evidence of any of the disqualifying facts set out in Canon 3 C of said rule, and there is conclusive evidence that counsel for appellant freely consented to the continued participation of the Trial Judge.

By their failure to object and the overt oral agreement of their attorneys, the parties are estopped to complain of the participation of the Trial Judge after the conclusion of the trial. Rule 6(a) 2, Rules of this Court.

It is a well known and well accepted rule that a party must complain and seek relief immediately after the occurrence of a prejudicial event and may not silently preserve the event as an "ace in the hole" to be used in event of an adverse decision. *Spain v. Connolly*, Tenn.App.1980, 606 S.W.2d 540.

Under the second issue, appellant states:

B. The Court became additionally prejudiced against the father as a result of the re-trial of the original divorce.

By footnote, the appellant states:

The father objected to the re-trial of the divorce. (R 2: 215 *et seq.* ...)

This is not a compliance with Rule 6(a)(1), (2), (3) Rules of this Court. See also *Schoen v. J.C. Bradford Co.*, Tenn.App. 1982, 642 S.W.2d 420.

Moreover, where the case is of such a nature that the Trial Judge would ordinarily be in position to remember and consider evidence previously heard by him, it is eminently fair and proper for a substitute judge to apprise himself of the former proceedings and evidence as background for the decision he is called upon to make.

In addition, appellant argues:

C. The Court continuously compared and applied its own personal experiences to this case and used personal standards to judge the case and became biased.

Appellant cites *Leighton v. Henderson*, 220 Tenn. 91, 414 S.W.2d 419, (1967), wherein a timely motion was made for recusal and overruled. No such procedure is cited in the present case.

■ Appellant cites numerous portions of the memorandum of the Trial Court as indicating that he was prejudiced by hearing evidence which had been presented prior to the divorce decree. It is not always the best practice for a Trial Judge to comment freely upon the details of the evidence heard. However, when this occurs, the correctness of the judgment reached is judged upon the result reached, rather than the explanatory comments of the Trial Judge. *Evins v. Price*, 63 Tenn.App. 627, 477 S.W.2d 204 (1971); *Overall v. Parker*, Tenn.Ch.App. 1899, 58 S.W. 905. T.R.A.P. Rule 13(d).

No merit is found in the appellant's second issue.

■ Appellant's third issue is:

Whether the Court erred in awarding $125,000 in attorney's fees to the mother and assessing all child advocate fees and costs against the father as an abuse of discretion.

Appellant concedes that the Trial Judge did have discretionary powers as to the matters of attorneys fees and costs.

This Court has examined the lengthy arguments challenging the award of attorneys fee for the services of counsel for the wife (and, incidentally for the child in the absence of the child advocate). No evidence is found of any misuse of discretion in this respect.

Appellant also challenges the taxing of part of the fee of the child advocate to him. Such award was within the discretionary powers of the Trial Judge which were not misused by him. *Salisbury v. Salisbury*, Tenn.App.1983, 657 S.W.2d 761.

No merit is found in appellant's third issue.

■ Appellant's fourth issue is as follows:

Whether the Court erred in refusing to change custody of the three year old child who graphically described abuse by the mother and her paramour to the father.

This issue is grounded upon the testimony which was disputed, thereby creating an issue of fact which the Trial Judge determined on the basis of credibility. On this subject, the memorandum of the Trial Judge states:

Assessing the credibility of the four principal adults is particularly important for a number of reasons. First, because what Rick has told people is the only real evidence of abuse, the credibility of those with whom Rick has talked is crucial. This is especially true of the father and stepmother who have testified in great detail about Rick's complaints and fears. Second, Booth has testified that he did not do it; there can be no more fundamental issue on the abuse question than whether Booth is telling the truth. Third, the mother has testified that there was no opportunity for Booth to have done those things he is accused of doing. If she is to be believed, then the Court must conclude that Booth did not do it. There are subsidiary issues which depend to a large extent on who is testifying accurately, such as when Rick first began talking about the sexual abuse, which parent refused to discuss civilly Rick's problems the week before the issuance of the May 24 change of custody order, and the character of the communi-

cations between Rick and the father and stepmother about abuse.

And, of course, aside from the question of whether Booth hurt Rick, the integrity of the parents as reflected in their willingness to speak untruthfully is fundamental to the underlying question of which parent is most fit to have custody.

The Court has heard nothing which detracts from the credibility of the mother and her fiance, Glenn Booth. The same cannot be said for the father and stepmother.

In April 1986, the father participated in a secret taped interview of Rick conducted at police headquarters by the District Attorney's office. In his May 1986 deposition when asked point blank what had occurred when he went to the District Attorney's office, the father did not reveal the secret taping. The only logical conclusion the Court can draw is that he intentionally misstated the facts in his deposition.

A recurrent theme of the mother's is that the father took Rick to place after place trying to confirm abuse. The father testified he took Rick to the Vanderbilt Hospital Emergency Room after having Rick examined by a pediatrician because Carol McCoy told him to. McCoy testified she did not tell the father to do that. The father's explanation of how he came to have Rick interviewed by Bonnie Beneke is different from Beneke's testimony.

Both the father and stepmother gave versions under oath in court about the cause of their psychiatric disorders in 1983 that are different than what they said then. They both testified it was the father's inability to see his son which was a cause. That is simply not what they told their doctors. Instead, it was the uncertainty of their own relationship, together with the father's guilt over leaving Rick and the mother, and the stepmother's grief over her late husband's death which they said in 1983 was the cause of their depression. And, both the father and stepmother gave a version under oath of why they separated in

April 1983 that is not the same as the one they gave their doctors then. The story of trying to help the father see his child is not found in any of the doctor's records.

The father and stepmother insisted under oath that not only did they not encourage Rick to call his mother Susan, but tried to get him to call her Mommy. Yet, in the pages of transcripts of tape recorded conversations they had with Rick, they did not correct him one time. Indeed, time after time, the father and stepmother themselves referred to her as Susan in conversations with Rick.

The father and stepmother testified about an unpleasant incident shortly after Rick was born in which Susan would not let the father hold Rick, and cursed the father. That is supposed to have happened in front of another couple, the Coles, who now live in Florida. The father was supposed to have apologized to Susie and the Coles. Mrs. Coles' telephone deposition was taken during the trial. She said the event did not happen.

In their trial testimony, both the father and stepmother testified that on the way to Dr. McKee's, Rick told them Glenn "tee-teed in my mouth". But in her deposition, the stepmother said something quite different. And, there is nothing about that in the father's sworn complaint filed just two days later.

The stepmother has given several different stories on the number of her miscarriages. She testified in Court she has had three. The record of a social worker interview of her at Donelson Hospital reflects six. Records from another hospitalization reflect six. She told the Department of Obstetrics and Gynecology at Vanderbilt she had five miscarriages.

There are many other discrepancies between the testimony of the father and that of other witnesses. Those and the conflicts the Court has discussed would not be too significant if there were only a few of them. But there are so many. The number of them and the obvious misstatement of the father under oath about the district attorney's meetings

lead to the unfortunate conclusion that the father and the stepmother have not testified truthfully in this case.

Finally, the forsaking of his solemn obligation as a father and husband by leaving his family and taking up with another woman is not something which reflects well on the father's integrity.

A final note on the credibility of a witness must be made. Jo Larrimer, the next door neighbor of the father and stepmother, described in vivid detail statements Rick has made to her about abuse by Booth and the mother. At one point in her trial testimony she broke down emotionally while describing a bath scene at her house after the May 28, 1985 court hearing. But in her deposition she testified she could not recall anything else that happened that day after the hearing. It is one thing for a witness to fail to recall all details of events; it is quite another to forget an event, the mere description of which drives the witness to an emotional breakdown. It is not likely that the witness Larrimer intended to misstate facts. But that major discrepancy between her deposition testimony and trial testimony raises question about the accuracy of her recall.

Where a witness is found to have testified falsely as to a material matter, the finder of fact is justified in disregarding the testimony of that witness entirely. *Jeffrey Mfg. Co. of Tenn. v. Underwood*, 221 Tenn. 275, 426 S.W.2d 189 (1968).

Where the issue for decision depends upon the determination of credibility of witnesses, the trial court is the best judge of that credibility, and its findings will be given great weight. *Royal Ins. Co. v. Alliance Co.*, Tenn.App. 1985, 690 S.W.2d 541.

Where the trial judge in a non-jury case saw and heard the witnesses and observed their manner and demeanor on the stand, the trial judge is in much better position than the appellate court to judge the weight and value of the testimony. The findings of a trial judge under such circumstances are entitled to great weight. *Duncan v. Duncan*, Tenn.App.1984, 686 S.W.2d

568; *Capital City Bank v. Baker*, 59 Tenn. App. 477, 442 S.W.2d 259 (1969).

Although not raised as an issue on appeal, a serious question is presented by the facts and procedure as to the nature of evidence presented to the Trial Court, particularly the hearsay testimony of out of court statements of an infant of age 2½ or 3 years.

T.C.A. § 24–7–116 provides for admissibility of recordings of statements of victims of child sexual abuse under the conditions stated in said statute.

No other statutory authority is found to authorize hearsay testimony as to out of court statements of a victim of child sex abuse.

There is no precise age within which witnesses are absolutely excluded upon a presumption that they have not sufficient capacity to testify. *Ball v. State*, 188 Tenn. 255, 219 S.W.2d 166 (1949); *Higgins v. Higgins*, Tenn.App.1981, 629 S.W.2d 20.

The standard for determining a child's competency to testify is not age, but intelligence and a sense of duty to tell the truth. T.C.A. § 24–1–101, *State v. Robinson*, Tenn.Cr.App. 1981, 618 S.W.2d 754.

Only a child who has a due sense of obligation and sanctity of an oath, who understands the evil of lying and that such wrongdoing is punishable, or who, having sufficient natural intelligence, has been so instructed as to comprehend the nature of telling the truth and consequences of a willful falsehood may properly be permitted to testify. *State v. Nelson*, Tenn.Cr. App. 1980, 603 S.W.2d 158.

Even though a witness suffering from incapacity of age may be competent to testify, the problems of the witness may affect the weight and credibility of the witness. *State v. McGee*, Tenn.Cr.App. 1980, 605 S.W.2d 840.

The maker of a dying declaration may be impeached in the same manner as if he had testified in person, including inconsistent statements of the declarant. *Williams v. State*, Tenn.Cr.App. 1976, 542 S.W.2d 827. This rule is properly applicable to all out of court statements *offered to prove the truth*

of their contents. See Federal Rules of Evidence Rule 806.

Psychiatric testimony as to the truthfulness of a witness is generally rejected, but in some cases it has been admitted. See authorities in footnotes, McCormick on Evidence, Third Edition § 45, pp. 105 et seq.

Expert opinion as to the capacity of children of a very tender age to comprehend and tell the truth is a valuable aid to the courts in determining the weight and credibility of statements of such children.

In the present case, the Trial Court certified the credibility of the mother and her intimate friend who denied misconduct. This Court is not in position to reverse this finding of the Trial Court.

The same may be said of the disbelief of the testimony of the father and his wife, but others also testified to statements by the child, and their testimony has not been impeached.

However, the credibility of the child himself has been impeached by his own inconsistent statements, by the contradiction by his mother and her intimate friend, and by the psychiatric testimony as to the capacity of a child of his age to distinguish truth from fantasy and susceptibility to suggestion and "programming". If the statements of the child were true, then the child should not be subjected to the danger of a recurrence of the alleged abuse. However, the statements of the child were vehemently denied by the wife and her intimate friend. Someone was telling the truth and someone was not telling the truth. The truthfulness of the child depends upon his capacity to speak the truth at his tender age without the validation of oath or cross examination, his susceptibility to suggestion and "brain washing", and the truthfulness of those who undertook to repeat the child's unsworn statements in open court. Under these circumstances, this Court is not in position to reverse the decision of the Trial Judge to believe the direct testimony of two unimpeached adults under oath in open court subject to cross examination in preference to the out of court statements of a child of very tender years under pressure of questioning by "experts".

Neither the Trial Judge nor any member of this Court is a deity or blessed with such psychic insight as to perfectly distinguish truth and falsehood. As human instruments, the Courts do the best they can to determine the more probable version of the facts, and they make no pretense or claim of infallibility.

If the factual issues have not been correctly decided at this time, "Murder will out"; the truth will ultimately be revealed. In the meantime, both parties appear to be unaware of the capacity of a human body and spirit to absorb abuse without permanent damage. If the parties could accomplish the miracle of being sensible, stop their nit-picking attempts to enforce a perfect environment for the child and let him grow up free of the continued stress of interrogation, examination, evaluation and litigation, they might find that the child is capable of growing up as a normal, healthy child.

No sufficient basis is shown for the reversal of the decision of the Trial Judge as to credibility, or as to his conclusions, for the evidence does not preponderate against them. T.R.A.P.Rule 13(d).

No merit is found in appellant's fourth issue.

Appellant's fifth issue is as follows:

Whether the Court erred in increasing child support from $425 to $600 a month.

It is uncontradicted that the expense of supporting the child is $817 per month.

Parents of a child are jointly responsible for the necessary expenses of their minor children. T.C.A. § 34-1-101.

The apportionment of the burden of child support is determined according to the ability of each spouse to contribute to the support. *Brooks v. Brooks*, 166 Tenn. 255, 61 S.W.2d 654 (1933).

The record shows that the earnings of the wife have doubled since the divorce. The amount of her earnings are shown to be $31,500 per year.

The record shows that, at the time of the divorce decree, the husband was earning

$56,000 per year, but no evidence is found as to his earnings at the time of the hearing.

The briefs of the parties appear to studiously avoid specifics as to the earnings of the parties, but expound at length upon the waste of such earnings, which is of little assistance to this Court.

In order to obtain a reversal to the order of support, it is necessary for the appellant to demonstrate that the evidence preponderates against the finding of the Trial Court. T.R.A.P.Rule 13(d). The meager information cited does not support a finding of preponderance against the judgment.

No merit is found in the fifth and last issue of the appellant.

The wife has filed three issues of which the first is as follows:

(i) Whether the Trial Court erred in not increasing child support from appellant to $817 per month?

There is no citation to the transcript to support the wife's argument of this issue. The only citation is to a 3 page affidavit of the wife filed with the Trial Clerk and transmitted to this Court as part of the technical record. Ordinarily, affidavits are not competent evidence and, unless shown to have been presented to and considered by the Trial Court, are not a part of the evidentiary record on appeal.

In said affidavit, the wife admits that she makes $31,500 per year, yet she insists that she is unable to bear any part of the expense of supporting her son.

There is no showing that the evidence preponderates against this determination of the Trial Judge or that he misused his discretion in this instance.

No merit is found in the wife's first issue.

The wife's second issue is as follows:

(ii) Whether the Trial Court erred in not awarding appellee all of her attorney's fees and costs incurred at trial and whether appellee is entitled to the attorney's fees and costs on appeal?

The brief of the wife asserts that she has accumulated a $250,000 debt for attorney's fees and expenses. There is no citation to the record to support this assertion. See Rule 6(a)(4) of the Rules of this Court.

The Trial Judge was of the opinion that the scope of this controversy had been extended beyond reasonable bounds, and this Court agrees. The explanation is probably hypercathesis (excessive concentration of desire upon a particular object).

Considering the number of divorced parents contending for the custody of a child, there must be a simpler, shorter, more economical means of resolving the issue than litigation extending over 3½ years, involving 630 pages of pleadings and orders, 9 weeks of trial, 45 witnesses, 7375 pages of testimony and 326 pages of argument to the court.

The judicial system has a right and duty to demand more efficient use of its time.

There is no showing that the Trial Judge misused his discretion in respect to award of attorney's fees to the wife.

On remand, the mother is free to apply to the Trial Court for attorney's fees on appeal.

Except as stated, no merit is found in the wife's second issue.

The wife's third issue is as follows:

(iii) Whether the Trial Court erred in declining to end visitation by appellant with the minor child pending psychiatric testing?

The grant or denial of rights of visitation rests in the sound discretion of the Trial Judge. There is no showing that he misused his discretion in this instance.

All actions of the Trial Judge under review are affirmed. Costs of this appeal are taxed against the appellant-husband. The cause is remanded to the Trial Court for such further proceedings, if any, as may be necessary and proper.

Affirmed and remanded.

LEWIS, J., concurs.

FRANKS, J., files a separate concurring opinion.

FRANKS, Judge, concurring.

I concur with Judge Todd's analysis and conclusions. However, the manner in which this trial was conducted should be addressed. As Judge Todd's opinion notes, the trial judge deplored counsel's trial "tactics" which the judge concluded "greatly protracted the case".

A trial court is not without authority to diminish or avoid such occurrences.

A trial judge has broad discretion in the conduct of a trial. He has discretion to limit the number of expert witnesses on each side as to a particular issue, *Conlee v. Taylor*, 153 Tenn. 507, 285 S.W. 35 (1926); *Powers v. McKenzie*, 90 Tenn. 167, 16 S.W. 559 (1891), and "may and should limit the number of witnesses on collateral matters." *Conlee*. Our Supreme Court has adopted Federal Rule of Evidence 403, which permits the trial court to exclude evidence upon considerations of "undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403; *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Moreover, a trial judge has broad discretion in refusing the admission of evidence in rebuttal which should have been introduced as evidence in chief. *See Hughes v. State*, 126 Tenn. 40, 148 S.W. 543 (1912).

"Limiting the time for the examination of witnesses, limiting the number of witnesses to a given point, and stopping repetitions and irrelevant examinations, are matter necessarily confided to a trial judge, whose discretion in such matters will not be interfered with on appeal except in case of abuse." 75 Am.Jur.2d, *Trial*, § 136, at 232.

The better practice is to establish these limitations in advance, which limitations of necessity must remain flexible throughout the trial. *Id.*, § 139.

An article in the current issue of *The Judges Journal* [1] states:

Court-ordered evaluations are one means of ensuring that all the parties participate. Court-ordered evaluations can also help to avoid multiple evaluations of the child by experts retained by each parent. Most mental health professionals skilled in sexual abuse assessments would concur with the following psychiatrist's assessment:

I don't want to be a hired gun for either parent, although I know that won't stop people from finding hired guns. My policy was to take only court orders and only cases where both parties and their attorneys agreed. I prefer that all relevant parties be specified in the court order. Everyone might not actually participate, but at least you start out from a strong position.

As a general rule, experienced evaluators suggest that reports addressing the issue of sexual abuse which are based on single interviews with the parties should also be viewed with caution. One psychiatrist warns that:

Good procedures would mean multiple interviews with all relevant parties. Any evaluation with a single interview with a child that produces highly charged or sexually aggressive materials from a child is suspect. I know that a lot of ... people would be very upset by that [statement]. They feel you have to get out the [anatomical] dolls and get it in one session. I don't know what you do about that attitude, but you can't produce reliable results that way.

Clinicians stress that neither a sex abuse nor a custody evaluation should be exclusively focused on the issue of sexual abuse. The evaluator is not attempting to prove whether or not a specific abuse episode occurred. In order to assist the court best, clinicians should be considering all aspects of the family in order to ensure that they do not mistakenly assign symptoms caused by other problems to the alleged abuse. This

---

**1.** Nancy Thoennes, *Child Sexual Abuse: Whom Should a Judge Believe? What Should a Judge Believe?, The Judges' Journal*, American Bar Association, (vol. 27, No. 3, 1988). The author notes "[c]ourts are overwhelmed by recent increases in the number of custody-visitation cases they are asked to hear that involve sexual abuse allegations." P. 16.

point is especially noteworthy in cases where children and parents may be reacting to a separation, divorce or conflict over visitation and custody, or to other stresses such as spousal violence. *Id.*, at 18 and 48.

A trial judge may and should enter a protective order in furtherance of the child's best interest to avoid subjecting a child to repetitive evaluations and examinations relating to the issue of sexual misconduct, and consider a court ordered evaluation to avoid multiple evaluations by "hired guns".

The foregoing suggestions are only some of the means at the disposal of the trial judge to avoid a repetition of the trial court's experience in this case.

TODD, P.J., and LEWIS, J., concur.