## IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT NASHVILLE

_____

|  |  |  |
|---|---|---|
| **SHARON LEE WRAY ALLEN,** | ) | Lawrence County Chancery Court |
|  | ) | No. 6524-95 |
| Plaintiff/Counter-Defendant/Appellant. | ) |  |
|  | ) |  |
| VS. | ) | C. A. No. 01A01-9511-CH-00505 |
|  | ) |  |
| **JEFFREY KEITH WRAY,** | ) |  |
|  | ) |  |
| Defendant/Counter-Plaintiff/Appellee. | ) |  |
|  | ) |  |

**FILED**

**June 19, 1996**

**Cecil W. Crowson**
**Appellate Court Clerk**

From the Chancery Court of Lawrence County at Lawrenceburg.
**Honorable Jim T. Hamilton, Judge**


**Randy Hillhouse**,
FREEMON & HILLHOUSE, Lawrenceburg, Tennessee
Attorney for Plaintiff/Counter-Defendant/Appellant.


**Paul Bates**,
**Christopher V. Sockwell**,
BOSTON, BATES & HOLT, Lawrenceburg, Tennessee
Attorney for Defendant/Counter-Plaintiff/Appellee.


OPINION FILED:

**AFFIRMED AS MODIFIED AND REMANDED**


**FARMER, J.**


**CRAWFORD, P.J., W.S.** : (Concurs)
**HIGHERS, J.** : (Concurs)

These post divorce proceedings were begun when Sharon Lee Wray Allen (Mother) filed a petition seeking to modify the divorce decree by awarding her custody of the parties' two minor children, Steven and Staci. Jeffrey Keith Wray (Father) answered and petitioned the trial court to grant him sole custody. Mother appeals from the judgment of the trial court which changed custody from joint custody to custody to Father and limited Mother's visitation.

Shortly before the parties were divorced, they executed a Marital Dissolution Agreement (MDA) agreeing to joint custody with the children to live with Father, and Mother to have visitation on alternating weekends. She was to pick up the children at school on Monday, Wednesday and Thursday and pick up only their daughter Staci on Friday. Father was to pick the children up at Mother's residence on those evenings at approximately 6:00 p.m. Staci was to spend Tuesday night with Father's parents and Steven to spend Friday night with them. The MDA, which was incorporated into the divorce decree, made no other specific provisions for holidays.

The order appealed from provides in pertinent part as follows:

Sharon Lee Wray Allen is awarded visitation privileges with the parties' minor children as follows:

Forty-eight (48) hours every other weekend from 6:00 p.m. on Fridays until 6:00 p.m. on Sundays as concerns Staci and from noon on Saturday until 6:00 p.m. on Sunday every other weekend as concerns Steven.

The father will have the children for the Easter holidays from 6:00 p.m. on the day that school recesses until 6:00 p.m. on the day before school resumes in odd years and the mother will have the children during said period in even years.

The father will have the children from 6:00 p.m on Friday until 6:00 p.m. on Sunday on Father's Day weekend regardless of whose weekend it is for visitation and that the mother will have the children on Mother's Day weekend regardless of whose weekend it is for visitation.

The father will have the children on Memorial Day weekend from 6:00 p.m on Friday until the following Monday at 6:00 p.m. in even years and the mother will have the children during said holidays in odd years.

The father will have the children on 4th of July weekend from 6:00 p.m. on Friday until the next following Monday in odd years and the mother will have the children during said holiday in even years.

The father will have the children on Labor Day weekend from

6:00 p.m. on Friday until the following Monday at 6:00 p.m. in even years and the mother will have the children during said holidays in odd years.

The father will have the children for Thanksgiving holidays from 6:00 p.m. the Wednesday before Thanksgiving Day until 6:00 p.m. the following Sunday before school resumes after Thanksgiving holidays in odd years and the mother will have the children during said period in even years.

The mother will have the children every Christmas vacation from the day that school recesses for Christmas holidays until 6:00 p.m. Christmas Eve provided that the father will have said children for the remainder of the Christmas holiday each and every year.

The mother will have the children for two full weeks in the summer of 1995 to coincide with her summer vacation from Perry Enterprises provided she will notify the father at least one week prior to the commencement of said vacation in 1995 and years thereafter will notify the father not later than May 1 of said vacation dates in order for the father to have an opportunity to have the children for a like vacation.

The weekends for Mother's Day, Father's Day, Memorial Day, Labor Day, Easter, and Thanksgiving shall take priority over any other schedule of alternating weekends, so a parent with the holiday weekend privilege shall have the children, even if he or she had the children the immediately preceding weekend. However, to avoid three consecutive weekends with the same parent as a result of said holidays, any alternating shall begin anew with the other parent getting the weekend privileges immediately following said holiday weekend. Likewise, if the Christmas period includes a weekend that would otherwise have been for the other, the other shall have the children for the next weekend thereafter with any alternating schedule beginning anew.

The Mother will make arrangements to see that the children are at their ball games; or in the alternative will wait to pick the children up after the ball games.

In the event that an extracurricular activity, which the minor children consider important, presents itself, the father, in good faith, will notify the mother at least 72 hours in advance of the pick up time of this activity; and the mother, in good faith, will honor the minor children's request to pursue these activities.

The mother will have access to the children's grades, medical treatment, medical records; and she will be notified of the children's extracurricular activities including ball games, school programs, recitals, etc.

Mother presents the following issues on appeal:

I.  Whether the Trial Court erred in talking to these young children over the objection of appellant without determining their capacity to testify.

II. Whether the Trial Court erred in limiting the time the non-custodial parent has to visit with her children.

III. Whether the Trial Court erred by failing to award custody of two young children with [sic] their mother.

We will address first the custody issue. The trial court may modify a decree awarding custody upon finding a material change in circumstances. *Musselman v. Acuff*, 826 S.W.2d 920 (Tenn. App. 1991); *Dalton v. Dalton*, 858 S.W.2d 324 (Tenn. App. 1993). Custody decrees remain within the control of the court and are subject to such changes or modifications as the exigencies of the case may require. T.C.A. § 36-6-101(a); *Dantzler v. Dantzler*, 665 S.W.2d 385 (Tenn. App. 1983). The paramount consideration in a custody proceeding is the best interest of the child.

At the time of entry of the divorce decree, Steven and Staci were ages 8 and 5 respectively. The modifying order was entered approximately one year later. The record reveals that Staci is a well-adjusted child and appears to have a good relationship with both parents. Steven has experienced a difficult childhood due to a medical problem which has resulted in his exhibiting anti-social behavior on numerous occasions. He was initially diagnosed and was treated for attention deficit with hyperactive disorder (ADHD) but was subsequently diagnosed as Psychosis NOS.

Anne Austin Fotrell, M.D., a psychiatrist board certified in adult psychiatry and board eligible in child psychiatry, testified by deposition. She testified that the history she obtained from Steven's parents was that, around the birth of his sister, he began to exhibit hyperactive behavior. He began to exhibit aggressive behavior, disorganized thinking, confusion and in general became extremely difficult to control in school environment. He has been excessively aggressive and difficult to focus, especially in the school setting, such as hitting others and destroying property. He was initially treated for ADHD which, in Dr. Fotrell's opinion, he clearly does not have and, in fact, the medication for that illness made him worse.

Based upon psychological testing by Dr. Joseph LaBarbera, a psychological examiner, Steven appeared to be psychotic, an inability to distinguish reality from fantasy and an inability to organize one's thoughts in a coherent fashion. This conclusion was reached by Dr. Fotrell, Dr. LaBarbera and Dr. Barbara Olsen, a pediatric neurologist. Dr. Fotrell first saw Steven the end of

March or the first of April 1995. She felt that his problem was a physical problem with external situational exacerbating features, meaning that his problem is aggravated by stimulus to which he is exposed in his everyday life. It was her feeling at that time that he was psychotic because he was anxious. He was started on an anti-psychotic medication in which he has responded quite well.

After performing several tests, it was determined that Steven is psychotic, probably as a permanent condition. However, follow-up pleased Dr. Fotrell in that Steven had done well on medication (Risperdal). Her diagnosis was Psychosis NOS (not otherwise specified) which means that she could not pin any sort of etiology to his psychosis. The psychosis of his type is considered an abnormality in brain chemistry. If he were an adult, she would term him schizophrenic. Continued treatment will consist of medication and she considers his environment to be instrumental in his treatment in that a child who is psychotic has special needs in terms of their environment. They do not need to be overstimulated. They need fairly consistent structure and routines.

She felt he had shown improvement and it was crucial that he stay in a regular classroom as long as possible. It was her recommendation that he have a stable structured lifestyle and no corporal punishment. She recommended that he not be involved in any sort of conflict inappropriate for an 8 year old, that he be left out of adult decisions.

With respect to his schedule, including spending Friday night with his paternal grandparents, she felt it was important that he have an established schedule with not a lot of deviation, that he is the type of child who would benefit maybe from a calendar on the refrigerator on which he could mark off days and see "these are the days I am going to be here" or "these are the days I am going to be there" so he knows well in advance. She felt it would be detrimental to deprive him of weekly visits with his paternal grandparents as he is very attached to them. Going to places he did not want to go would make him anxious and in this child "anxious is bad news." She advised against taking him out of school before school had dismissed.

He has been to her office on a number of occasions and was brought each time by his father and stepmother. His mother attended one session. During his sessions, Steven voiced that he was afraid of his stepfather, didn't like him because he spanked him too hard. He would not talk

much at all about his mother, despite repeated invitations to do so. Dr. Fotrell also was of the opinion that decisions regarding visitation, for example, should be made by the adults and not by Steven.

Mother testified that she no longer worked at Murray and is presently employed at Perry Enterprises working from 7 to 4 Monday through Thursday and gets off at 1:00 on Fridays. (We assume she meant 7:00 a.m. to 4:00 p.m.) If awarded custody, her grandparents and a neighbor who has a day care would keep the children when she was not at home. She described the episode when Jeff Allen (her present husband) spanked Steven and said that she had had little visitation since that time. This occurred before she and Mr. Allen married. She allowed him to spank Steven because Steven had thrown an object at Mr. Allen.

Staci has never been a behavioral problem, is doing well in school and has continued to visit her mother on a regular basis and gets along well with Mr. Allen. Mother described three incidents when her former husband lost his temper in the presence of the children. She also described an incident when he was screaming at her in the presence of the children and asked Staci if she wanted to live with him or Mr. Allen. She testified on cross that she had never attended any of the ADHD support meetings since the divorce.

She met with Dr. Fotrell twice and none with Drs. Olsen and LaBarbera. However, she said that her former husband would not tell her about these appointments until the day before. She related an incident when Steven was at the hospital and she inquired about a Sunday afternoon visit and was told by the staff that he had left with his father. When she asked Steven about it he said that the staff had taken him to the fun center. When she let him know that the staff had told her that his dad had taken him he said "well, since you already know I guess I can tell you the truth." When she asked him who told him to lie to her he said daddy made him do it.

Father teaches and coaches football at the high school level. He testified that Staci has a good relationship with her mother. Both parents testified that the children should remain together. He testified that he had never told Steven he could not go for visitation with his mother.

He described his schedule as arriving at school between 7:30 and 7:45. He takes Steven to Lawrenceburg Public School. Football practice had been ending between 4:30 and 5:00 but with the new block schedule will be ending around 4:00 at the latest. His present wife does not work outside the home. He attends the Freshmen or B Team games at home and Steven usually accompanies him if he has done his homework. Staci accompanies him to basketball games. He denied ever running down his ex-wife in the presence of the children.

He admitted that Steven had a "horrible school year" the previous year. He testified that he has noticed a considerable change in Steven since taking Risperdal. Prior to this medication, Steven had a hard time controlling his emotions, instances of hallucination and inappropriate reaction to normal circumstances. He was the one that made the arrangements for Steven to be seen by the health care professionals and the only assistance his former wife offered was to keep Staci. During the fifteen days Steven was hospitalized, he made nine trips including taking him and returning him home. He also attended family counseling sessions. Although Mother told them she would attend one of the sessions, she did not attend. The counseling sessions dealt with how to deal with Steven when he was released from the hospital and is called After Care. Mother attended none of these sessions.

He did not take summer employment during the past year so he could spend more time with the children. When it was believed that Steven was suffering from ADHD, Father scheduled his hours of in-service training on how to deal with children with this problem. He stated that the children are very close to his parents and Steven has spent every Friday night with them since he was 2 years old. He denied that he had conditioned Steven to be afraid of Sharon's husband but, to the contrary, had encouraged him to visit his mother. He attends practically all of Steven's baseball practices, but to his knowledge Mother has not attended any. He believes that Steven's fear of Jeff Allen is genuine.

Father testified that Mother did not attend any of the ADHD meetings. She also did not attend any M Team meetings, which was described as where teacher's aides, the administrator and parents are involved in a group discussion to plan an IEP (Individualized Education Plan) for the student. He testified that Steven told him that Jeff Allen had spanked him on one occasion, about

two weeks after Sharon and Jeff were married, for spilling popcorn.

It is apparent from our review of this record that the relationship of the parents is such that joint custody is no longer workable and not in the best interest of the children. As this Court said in *Dodd v. Dodd*, 737 S.W.2d 286, 289-290 (Tenn. App. 1987):

> There needs to be one residence, one haven in all the storms of life, including those storms whipped up by the winds of divorce. There needs to be one parent with primary control and responsibility for the upbringing of the parties' children, whenever possible. Custody, in reality, means responsibility for the care, nurture and development of the mental, emotional and physical needs of the child. The custodial parent should expect and receive cooperation and assistance from the non-custodial parent in every respect to serve the best interests of their child or children.

*Dodd*, 737 S.W.2d at 289-290.

Our review is *de novo* with a presumption that the trial court's findings of fact are correct unless the preponderance of the evidence is otherwise. Rule 13(d) T.R.A.P.; *Hass v. Knighton*, 676 S.W.2d 554 (Tenn. 1984). The paramount consideration in a custody proceeding is the best interest of the child. Changed circumstances in this case include the fact that both parents have remarried, the children's relationships with their respective stepparents and the fact that, as previously noted, the relationship of the parties is such that joint custody is not workable. Both parents agree that it would be in the best interest of the children for them to remain together. They have lived in their Father's home, pursuant to the parties' initial agreement, since the divorce. They appear to be well-adjusted (which we recognize in Steven's case is a relative term). The children have a good relationship with their Father and stepmother. The relationship with their stepfather, particularly in Steven's case, leaves much to be desired. Despite the seriousness of Steven's medical problem, his stepfather testified that he and Mother do not discuss Steven's problem and, when asked how he was going to recognize and take care of it if he was not aware of it, responded "when we find out if he's got one, we will take care of it."

Mother argues that the trial court failed to apply the tender years doctrine. Given the ages of the children, we seriously doubt the application of the doctrine to this case. However, when

applicable, it is but one factor to be considered. Having reviewed this record, we do not find the evidence to preponderate against the trial court's finding that the best interest of the children is served by Father having custody.

With respect to visitation, the MDA did not make provisions for holiday visitations. Given the circumstances of this case, we believe the trial court exercised sound discretion in establishing a holiday visitation schedule. However, with respect to Staci, we do not find the evidence to preponderate in favor of a finding that it is in her best interest to vary the visitation with respect to Mother picking her up at school on Monday, Wednesday and Thursday with Husband picking up Staci at Wife's residence on those evenings at approximately 6:00 p.m. However, Mother should not take Staci from school prior to the ending of the regular school day. During summer vacation, we find no reason why Mother's visitation on those three days should not extend until approximately 9:00 p.m. The judgment of the trial court is modified accordingly. On the other hand, we believe the evidence preponderates in favor of the trial court's findings that Mother's visitation with Steven be in accordance with the trial court's decision.

At the time the trial court indicated the desire to talk with the children, Mother's attorney objected on the basis that the children were too young. Counsel's statement to the court that "I don't think the children are of an age that you need to be talking to them. It would be over our objection" could be construed as a reference to T.C.A. § 36-1-106(7) or the children's inability to appreciate the obligation to testify truthfully in a court of law.

In determining custody, the court is to consider all relevant factors, including the reasonable preference of the child if twelve years of age or older. The court may hear the preference of the younger child upon request but the preferences of older children should normally be given greater weight. T.C.A. § 36-6-106(7). Every person is presumed competent to be a witness unless otherwise provided in the rules or by statute. Tenn.R.Evid. 601. Every witness is required to take an oath or affirmation before testifying. Rule 603.

Age or mental status does not automatically bar one from testifying under Tenn.R.Evid. 601. If a witness is of sufficient capacity to understand the obligation of an oath or

affirmation, absent some rule or statute to the contrary, the witness is competent. The question of competency is a matter for the trial court's discretion. *State v. Caughron*, 855 S.W.2d 526, 538 (Tenn. 1993), cert. denied, 114 S. Ct. 475 (1993). The defendant in *Caughron* argued that the failure of the trial court to ask the minor whether she understood the difference between telling the truth and a lie and whether she comprehended the importance of telling the truth rendered her competency evaluation conducted before she testified inadequate. The trial judge asked the minor some general questions, such as how she was doing in school and how her counseling was progressing and some questions about her awareness of the testimony. The supreme court ruled that the trial judge did not abuse his discretion.

As stated in *Gotwald v. Gotwald*, 768 S.W.2d 689, 697 (Tenn. App. 1988):

> Only a child who has a due sense of obligation and sanctity of an oath, who understands the evil of lying and that such wrongdoing is punishable, or who, having sufficient natural intelligence, has been so instructed as to comprehend the nature of telling the truth and consequences of a willful falsehood may properly be permitted to testify. *State v. Nelson*, Tenn. Cr. App. 1980, 603 S.W.2d 158.

*Gotwald*, 768 S.W.2d at 697.

Father's attorney inquired as to whether the court desired to talk to the children. At that point Mother's attorney objected stating "I don't think the children are of an age that you need to be talking with them." The court then stated that he then wished to ask them a few questions and the children were questioned in chambers with both attorneys and the court reporter present. There is no indication in the record that the children were administered the oath. In addition to being questioned by the trial judge, the children were questioned by both of the attorneys. Both children expressed a desire to live with their father.

These children are both under the age of twelve and the record does not indicate that they were administered an oath. However, we find that any error in this regard is harmless. Rule 36(b) T.R.C.P. Excluding the statements of the children, the evidence does not preponderate against the trial court's finding that the best interest of the children is served by placing custody with the

father.

The judgment of the trial court is affirmed as modified and this cause is remanded for any further necessary proceedings.  The costs of this appeal are taxed one-half to Jeffrey Keith Wray and one-half to Sharon Lee Allen, for which execution may issue if necessary.

_____
FARMER, J.


_____
CRAWFORD, P.J., W.S. (Concurs)


_____
HIGHERS, J. (Concurs)