WILLIAMS *v.* STATE.

(*Jackson*, April Term, 1948.)

Opinion filed June 12, 1948.

CLARKE, MORGAN &-NORRIS, of Brownsville for plaintiff in error.

J. MALCOLM SHULL, Assistant Attorney General, for the State.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

Herbert Williams appeals from a conviction of stealing a hog of Guy Williams. It is insisted by his assignments of error that the *corpus delicti* was not established, and that he was convicted upon an alleged confession illegally obtained.

Guy Williams, the prosecutor, had six hogs of an average weight of 250 pounds in a certain pasture. He saw them in that pasture on a certain Friday in January of 1946, but upon his return the following Sunday morning they were gone. This pasture adjoined a field belonging to witness McNeil. One of the gates in the line fence between the two fields had been torn down and the wire had been pulled up at another point. On that same Sunday morning five of these hogs came to the barn of McNeil, and for safe keeping were placed by him in a pen. The sixth hog has never been found and is the one which defendant, Herbert Williams, has been convicted of stealing.

Prosecutor Williams and McNeil on that Sunday morning observed the tracks of a wagon commencing in McNeil's field and "it appeared that something had been dragged behind the wagon starting at a point near where this fence was pulled away from the post". McNeil and the prosecutor followed this track and "sign" through the field into the public road and down the public road

to the front of the house of a Negro named Fergusion. There "the sign played out". There is no evidence that the thing dragged behind the wagon, the "sign" of which thing "played out" in the public road in front of Fergusion's house, was a hog. No one testified as to the evidence of either blood or hair or hog tracks in the imprint being made by that which it appeared had been dragged behind the wagon. Fergusion was arrested, but subsequently released and no indictment ever returned against him.

"A" wagon track was observed in the public road in front of Fergusion's house. The prosecutor and McNeil followed this track on down the public road to where a Negro by the name of Lucas lived. There was no sign of anything being dragged behind the wagon which made this track; nor is there any evidence connecting plaintiff in error, Williams, with any wagon.

On the day before (Saturday) Lucas had slaughtered four of the six hogs which it is conceded on all sides he had in his fattening pen all of that fall. The prosecutor and McNeil went in the smoke house of Lucas, took the fresh meat out of the salt, and satisfied themselves that the missing hog was not one of the four which Lucas had killed the previous day.

Lucas owned and had in this fattening pen two other hogs and a large sow which he had not slaughtered that Saturday. A ten year old darkey by the name of Kidd who lived on the prosecutor's farm had spent the night at the home of Lucas with a play mate, the son of Lucas. The family got up and this boy left before day light on Saturday morning. The hog pen was close to the residence of Lucas. This boy testified that before he left to go home on that Saturday morning he saw by lantern light the hogs in the pen of Lucas. One of them was a

large black hog which this little Negro thought "was Mr. Guy Williams' hog".

If the thing dragged by the wagon in and from the field to the public road, thence to the home of Fergusion was a 250 pound hog, and if the hog which this little Negro boy saw with the other hogs on Saturday morning in the pen of Lucas was that dragged hog, then we have indeed an almost unbelievable recovery by the hog from the extremely rough treatment of being dragged through a field and along a public road on Friday night. Further, the five other hogs were not detected in the adjoining field by Mr. McNeil until Sunday morning. It seems to be conceded that the hog which the little Negro says he saw on Saturday morning by lantern light was a big black sow that belonged to Lucas.

Based upon the evidence hereinabove recited the prosecutor procured a warrant on Monday morning charging Lucas with the theft of his hog. Present when Lucas was arrested were sheriff Hunter, and his chief deputy Jack Hunter, the prosecutor Williams and one other white man.

When arrested, Lucas denied that he was guilty or had anything to do with the hog. Thereupon, chief deputy Hunter struck him in the face and started to strike him again when the sheriff interceded. These four white men then took Lucas to the home of prosecutor Williams, and on the way some of them threatened to hang Lucas, and said when they got to Mr. Williams' home they would get a rope. One of these men, Norville, threatened Lucas "with a large stick". In this situation, Lucas told these men that he had nothing to do with the taking of the hog but that Herbert Williams, plaintiff in error here, had brought the hog to his house and he, Lucas had made Williams take it away.

Plaintiff in error, Williams, had gone to a nearby town that day and was not present when Lucas made the above statement. He also was a Negro, and had lived for several years with Lucas. Based upon the statement made by Lucas under the circumstances above detailed a deputy sheriff went to this town some few miles away and arrested Williams who denied any connection with the matter under investigation. He was brought back to where Lucas was being held and both of them were then taken to the jail and placed in the same cell sometime that evening. When the two were brought together Lucas said to Williams "you know I had nothing to do with this thing". Williams did not reply.

There is no evidence in the record as to whether Lucas told Williams after they were put in the jail about the treatment and threats to which he, Lucas, had been subjected by these officers and their friends, all white men, on that day. It would seem, however, to be a reflection upon normal intelligence based upon common knowledge of men to think otherwise than that Lucas while in the jail cell had told Williams of the treatment to which he had been subjected. However that may be, this same chief deputy Hunter, who had struck and threatened Lucas, came into the jail that night and told plaintiff in error that he, plaintiff in error Williams, "must confess and if he did not confess he was going to whip him and he drew back his hand as if to strike defendant Williams, whereupon this defendant Williams stated to him that he did take the hog and that he killed it and carried it out in the bottom and hung it in a tree and later that he carried it out in the bottom and buried it". All of the above detailed statement of Lucas and confession of Williams was excluded from the jury.

These statements and confessions, however, and the circumstances under which they were obtained, continue to be of material importance in the disposition of this case by reason of another confession said to have been made the next morning by plaintiff in error Williams.

A man by the name of Dewey Couch had been living at the jail for two or three years. He acted as turn key when the sheriff was not there and served as special officer when needed. He went with the officers to make arrests, and had access to the jail and the keys, and frequently went into the prison part of the jail. He was not a regular deputy sheriff but he may in fact be considered a *de facto* deputy sheriff. In so far as it applies to the legal effect of a confession which he says Williams made to him, we think the same rule must be applied under the facts stated as if he were a regular commissioned deputy of the sheriff.

This officer Couch occupied what is called the trusty's room on the second floor of the jail building. That is the floor on which the prison is located. Before officer Couch left his aforesaid room on the morning after chief deputy Hunter had by threats of violence procured from plaintiff in error Williams the aforementioned confession, he, officer Couch, says that he heard Lucas say to his cell partner Williams "to keep his mouth shut as they had no proof on them for the violation of any law." Couch was impressed in some manner by this admonition of Lucas to Williams because, as the record expresses it, when Couch heard the admonition he "thereupon" went to the cell where these two men were confined and proceeded to question them. Notwithstanding the fact that Williams had just been admonished "to keep his mouth shut as they had no proof", Williams then and there

again made the same confession to this man whom he had every reason to believe was one of the officers.

The above testimony upon the part of officer Couch was seasonably objected to on the ground that "the State had failed to show that the duress or fear placed on the defendant had been removed and that there was nothing to show that these statements were voluntarily made." The admission of this confession is assigned as error. Lucas is not before the Court, he having been acquitted at the suggestion of the district attorney general.

It is apparent from what has hereinbefore been said that unless the testimony of officer Couch as to this second confession is competent, this case must be reversed, because, aside from that confession, there is no substantial evidence connecting plaintiff in error with the alleged theft. It is appropriate here to notice that these officers who had obtained the confession from this Negro after threats of doing him injury did not take Williams to the place where they say he told them he buried the hog, and thereby ascertain whether there was any truth in the confession made under the circumstances stated.

██ The incompetency of testimony of a confession obtained as a result of threats of violence is generally known, and generally denounced. The exclusion of the confession so obtained on Monday night did not, *per se,* make competent the confession made in the cell the next morning to another deputy who expressed no threat. This Court in *Wilson* v. *State,* 50 Tenn. 232, 244 held that: "When confessions once made under fear or hope are repeated, it is presumed that a subsequent confession is made under the same influences; and the burthen is upon the prosecutor to show that this is not so," citing cases. The rule is reiterated by this Court in *State* v. *Henry &*

*Frazier*, 65 Tenn. 539, 542, in this language: "The party remained in the custody of the same parties who had extorted the confession from him. There was no question but that these influences might well have been presumed to continue, and that the subsequent confessions were made under their influence, and that the *onus* was on the State to show them removed, and that the confessions were not brought out by such improper influences, but were free and voluntary." Wigmore on Evidence, Section 853, after stating that "the question often arises whether a confession subsequent in time to the inducement was in fact influenced by it", then asked the question, Section 855 "must it be shown clearly that an improper inducement, once offered, was brought to an end?", and in answer to this question in the same paragraph, page 336 says: "The general principle is universally conceded that the subsequent ending of an improper inducement must be shown; *i. e.*, it is assumed to have continued until the contrary is shown".

■ The rule just stated is applicable to the evidence in the instant case. An analysis of that evidence discloses that the State has failed in its duty to carry the burden of showing that the confession made on Tuesday morning to officer Couch was not influenced by the threat of violence made on Monday night by chief deputy Hunter to the prisoner. In fact, we think the evidence is to the effect that this Negro prisoner, when he repeated the confession to officer Couch Tuesday morning was motivated by fear of the threat made a few hours earlier. On that morning his friend and cell mate had just completed admonishing Williams "to keep his mouth shut as they had no proof on them for a violation of any law". "Thereupon" officer Couch entered the cell and renewed questions concerning his guilt. So, notwithstanding the

admonition just received, this Negro repeated the con-
fession to the officer in whose power he was at the mo-
ment. We think this reflects a continuation of the fear
of violence which had been threatened a few hours earlier.
Our thought is that the Trial Judge overlooked the rule
with reference to continuation of the fear, when he held
the second confession competent. The assistant attor-
ney general in brief submitted in behalf of the State con-
cedes doubt as to the competency of evidence of this
second confession.

Reversed and remanded.

All concur.