# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 19, 2000 Session

## STATE OF TENNESSEE v. WAYNE JOSEPH BURGESS, JR.

**Appeal as of Right from the Circuit Court for Giles County**
**No. 8,401     Jim T. Hamilton, Judge**

---

**No. M1999-02040-CCA-R3-CD - Filed January 18, 2001**

---

The appellant, Wayne Joseph Burgess, Jr., was convicted by a jury in the Giles County Circuit Court of one count of first degree felony murder, with the underlying felony being aggravated child abuse. The trial court sentenced the appellant to life in the Tennessee Department of Correction. The appellant raises the following issues for our review: (1) whether the trial court erred in overruling the appellant's motion to strike the jury panel because the appellant's race was substantially under-represented on the venire from which the petit jury was selected under a practice providing "the opportunity for discrimination;" (2) whether the trial court erred in overruling the appellant's motion to suppress a confession that was obtained by the use of intimidation, threat, and coercion by the Pulaski Police Department; (3) whether the trial court erred in overruling the appellant's objection to allowing the prior inconsistent statement of Rickey Sikes to be entered into the record as substantive evidence; (4) whether the evidence was sufficient to support the appellant's conviction of first degree murder in the perpetration of aggravated child abuse as the State failed to prove the requisite mental status of "knowing" to commit that offense. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES, and THOMAS T. WOODALL, JJ., joined.

James Michael Marshall and Bobby Sands, Columbia, Tennessee, for the appellant, Wayne Joseph Burgess, Jr.

Paul G. Summers, Attorney General and Reporter, Todd R. Kelley, Assistant Attorney General, Richard Dunavant and Robert C. Sanders, Assistant District Attorneys General, and Mike Bottoms, District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

On August 8, 1997, Nacia Rivers and the victim, Nacia's sixteen-month-old daughter, Nakevia Rivers, picked up the appellant, Wayne Joseph Burgess, Jr., at his home at around 4 p.m. He accompanied them on a shopping trip to Lawrenceburg. The victim wore a "diaper suit" during the excursion. The victim stayed awake during the trip to Lawrenceburg and even ate some of the appellant's hamburger and drank some of the appellant's Dr. Pepper when the trio stopped at a Sonic Drive-In Restaurant for food. They returned to Rivers' home in Pulaski around 7 p.m., and the victim slept during the entire return trip.

The appellant carried the sleeping victim into Rivers' home and placed her beside him on the couch. Rivers returned to the car to retrieve the diaper bag. After reentering the residence, Rivers proceeded upstairs to use the restroom and subsequently began to tidy her bedroom. While still upstairs, Rivers heard the victim moan, and she went downstairs to investigate. Rivers found the victim, wearing only a diaper, lying across the appellant's lap. The victim could not sit or stand and was also lethargic and unresponsive. Rivers took the victim to the nearby Hillside Hospital. The victim stopped breathing on the way to the hospital.

At the hospital, Nurse Kathy Norman placed the victim in the pediatric crash cart. The victim was unresponsive, and her respiration was slow. When the victim stopped breathing, the hospital staff intubated her to begin artificial respiration. Additionally, medical personnel gave the victim intravenous fluids through her rectum because of her severe dehydration. Dr. Dusan Teodorovic was called, and the victim was stabilized for transfer to Huntsville Hospital in Alabama.

Upon arrival in Huntsville at around 9 p.m., the victim was unconscious and her abdomen was firm and very distended. The medical staff attempted to resuscitate the victim for one hour and forty-five minutes before pronouncing her dead at approximately 10:45 p.m.

Medical Examiner Dr. Charles Harlan, performed an autopsy on the victim and concluded that, in addition to other internal injuries, the cause of death was a laceration to the victim's liver, which caused extensive internal bleeding.[1] The laceration to the liver was approximately two inches long, one-third of an inch deep, and one-half of an inch wide, and was caused by blunt trauma to the abdomen. Dr. Harlan testified that "a blow or blows of considerable force" would be required to cause such an injury. Additionally, Dr. Harlan stated that the victim's death occurred within a few hours after the injury.

On August 12, 1997, Officer Joel Robinson called the appellant and asked him to come to the police station to discuss the events surrounding the victim's death. The appellant voluntarily walked to the police station. During questioning, the appellant repeatedly asserted that he had nothing to do with the victim's death. On August 13, 1997, the police requested that the

---

[1] Dr. Harlan recovered four pints of blood from the victim's belly and one-fourth of a pint of blood from the right side of the victim's chest.

appellant return to the police station. The appellant again voluntarily walked from the Martin College Library where he was doing research to the police station and submitted to additional questioning. Officer Robinson interviewed the appellant while the appellant sat beside Officer Robinson's desk, and Investigator John Dickey occasionally participated in the interrogation. Officer Robinson thoroughly advised the appellant concerning his Miranda rights, carefully reading the appellant's rights line by line and obtaining the appellant's indication of understanding after each line. Subsequently, the appellant signed a waiver of those rights.

The police questioned the appellant for approximately one and one-half hours. At some point during the interview, Investigator Dickey told the appellant that he did not believe that the appellant was telling the truth. Furthermore, Investigator Dickey informed the appellant that if he did not tell the truth, the investigator would "put his shoe up [the appellant's] ass." Investigator Dickey clarified his statement by telling the appellant that he was not threatening the appellant with physical force, but was speaking figuratively, and he would "do everything [possible] to see that justice is done." The appellant subsequently gave a statement, confessing to hitting the victim in the stomach.

A jury in the Giles County Circuit Court convicted the appellant of one count of first degree felony murder, with the underlying felony being aggravated child abuse. The trial court sentenced the appellant to life in prison in the Tennessee Department of Correction. The appellant raises the following issues for our review: (1) whether the trial court erred in overruling the appellant's motion to strike the jury panel because the appellant's race was substantially under-represented on the venire from which the petit jury was selected under a practice providing "the opportunity for discrimination;" (2) whether the trial court erred in overruling the appellant's motion to suppress a confession that was obtained by the use of intimidation, threat, and coercion by the Pulaski Police Department; (3) whether the trial court erred in overruling the appellant's objection to allowing the prior inconsistent statement of Rickey Sikes to be entered into the record as substantive evidence; (4) whether the evidence was sufficient to support the appellant's conviction of first degree murder in the perpetration of aggravated child abuse as the State failed to prove the requisite mental element of "knowing."

## II. Analysis
### A. Jury Panel

The appellant argues that the trial court should have stricken the jury panel because the jury venire was selected under a practice providing the opportunity for discrimination and resulting in the underrepresentation of the appellant's race. The appellant maintains that, out of the 105 people who were sent jury duty notices, only 70 answered the jury call. Out of those 70, only six were African-Americans.

We recognize that "[t]he burden is, of course, on the [appellant] to prove the existence of purposeful discrimination." Whitus v. Georgia, 385 U.S. 545, 550, 87 S. Ct. 643, 646 (1967). In determining whether, pursuant to the Sixth and Fourteenth Amendments, a jury was properly selected from a fair cross-section of the community, we utilize the three-pronged test set forth in

<u>Duren v. Missouri</u>, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979), which states that the appellant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;
> (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.

<u>State v. Mann</u>, 959 S.W.2d 503, 535 (Tenn. 1997)(citing <u>Duren</u>, 439 U.S. at 363, 99 S. Ct. at 668)(footnote omitted). Moreover, although the appellant has the right to be tried by a jury selected in a non-discriminatory manner, it has never been held that the jury must exactly mirror the ethnic composition of the community. <u>See</u> <u>Batson v. Kentucky</u>, 476 U.S. 79, 85-86, 106 S. Ct. 1712, 1717 (1986).

If the appellant makes out a prima facie case of discrimination, "the burden shifts to the State to rebut the presumption of unconstitutional action." <u>State v. Nelson</u>, 603 S.W.2d 158, 166 (Tenn. Crim. App. 1980). The presumption can be rebutted by demonstrating that "'a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process, such as the exemption criteria, that result in the disproportionate exclusion of a distinctive group.'" <u>Id.</u> at 166-167 (quoting <u>Duren</u>, 439 U.S. at 367-68, 99 S. Ct. at 670).

The appellant has automatically satisfied the first prong of the <u>Duren</u> test because the Supreme Court has recognized African-Americans as a distinctive group in the community. <u>Mann</u>, 959 S.W.2d at 535; <u>see also</u> <u>Alexander v. Louisiana</u>, 405 U.S. 625, 628, 92 S. Ct. 1221, 1224 (1972). However, the sole proof that the appellant presented in support of his motion to strike the jury panel due to discrimination in the selection of the jury pool was the testimony of Judy Calahan, the Circuit Court Clerk for Giles County. She testified that the jury is selected from a list of registered drivers and that

> it is now done by computer. We just put in how many we would like to have selected. Usually, it's about 600. And it's done at random. We never look at them. We have a Jury Commission that comes in and takes the sheets and goes through them, and if they know there is somebody on there that is deceased or . . . you know, they mark them off.

Additionally, Calahan maintained that the revised list is then sent to the Sheriff's Department for the jury duty notices to be sent. Furthermore, Calahan originally stated that she believed that the population of Giles County is twenty-five percent African-American but subsequently agreed with defense counsel that the percentage could range from fifteen to twenty-five percent African-American.

Initially, we note that our supreme court has approved the use of driver's license rolls to select potential jurors. <u>Id.</u> Additionally, there is no evidence in the record to suggest that using the driver's license rolls has resulted in the systematic exclusion of African-Americans from the jury panel. <u>See</u> <u>State v. Caruthers</u>, 676 S.W.2d 935, 940 (Tenn. 1984); <u>State v. Taylor</u>, No. 02C01-9501-CR-00029, 1996 WL 580997, at *19 (Tenn. Crim. App. at Jackson, October 10, 1996). Furthermore,

-4-

almost ten percent of those who answered the jury call were African-American. Moreover, Calahan testified that Giles County employs a random selection of persons called for jury duty. Based solely upon this testimony, the appellant has failed to prove that "the under representation [of his race on the jury panel] is due to a systematic exclusion of the group in the jury selection process." Mann, 959 S.W.2d at 535.

The appellant also claims that there is an "opportunity for discrimination" in the selection of the jury venire because the Jury Commission strikes the deceased and the elderly from the list and because the Sheriff's Department could selectively send jury notices. Furthermore, the appellant cites Whitus v. Georgia, 385 U.S. at 552, 87 S. Ct. at 647, as support for his proposition that he only has to prove that there has been an "opportunity for discrimination" in jury selection to make out his prima facie case for discrimination. However, we believe that this case is distinguishable from Whitus. In Whitus, the jury selection was based on tax rolls that were segregated on the basis of race. In contrast, there has been no proof introduced in the instant case to suggest that the race of potential jurors was indicated in any way on the jury list, nor is there proof to indicate that the Jury Commission or Sheriff's Department engaged in discriminatory practices in establishing a jury pool. This issue is without merit.

B. Confession

The appellant basically alleges that the trial court should have suppressed his confession as being involuntarily made because it was obtained only after he was threatened by Inspector Dickey and because questioning continued after he had requested an attorney. At a motion to suppress hearing, the trial court, as the trier of fact, resolves the questions concerning the credibility of witnesses, the weight and value of the evidence, and conflicts in the evidence. State v. Brewster, No. M1999-00989-CCA-R3-CD, 2000 WL 549277, at *3 (Tenn. Crim. App. at Nashville, May 5, 2000)(citing State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Accordingly, this court will uphold the trial court's decision on a motion to suppress unless the evidence contained in the record preponderates against the trial court's findings. Id.

Generally, the Fifth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. State v. Callahan, 979 S.W.2d 577, 581 (Tenn.1998). However, if an accused is informed of his Miranda rights and knowingly and voluntarily waives those rights, he may waive the privilege against self-incrimination. Id. (citing Miranda v. Arizona, 384 U.S. 436, 444-445, 479-478, 86 S. Ct. 1602, 1612, 1630 (1966)). Additionally, the trial judge's findings of fact at the motion to suppress hearing are accorded the weight of a jury verdict. State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). Accordingly, the trial court's decision is binding upon this court if the decision is supported by a preponderance of the evidence. Odom, 928 S.W.2d at 22-23.

This court must consider "the totality of the circumstances to determine whether the confession is admissible." State v. Shoffner, No. 03C01-9403-CR-00113, 1995 WL 382628, at *3 (Tenn. Crim. App. at Knoxville, June 27, 1995)(citing State v. Kelly, 603 S.W.2d 726, 728-29

(Tenn. 1980)). Accordingly, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Furthermore, this court has stated:

> Coercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was "such as to overbear [the appellant's] will to resist and bring about confessions not freely self-determined." The question must be answered with "complete disregard" of whether or not the accused was truthful in the statement.

State v. Phillips, No. E1999-01104-CCA-R3-CD, 2000 WL 336960, at *5 (Tenn. Crim. App. at Knoxville, March 31, 2000)(citations omitted).

In this case, the appellant voluntarily walked to the police station for questioning. Additionally, Officer Robinson testified that he thoroughly discussed the appellant's Miranda rights with the appellant, and the appellant subsequently signed a waiver of those rights before questioning. See State v. Carter, 16 S.W.3d 762, 767 (Tenn. 2000)(stating that proof that a defendant was made aware of his Miranda rights, although not conclusive, weighed in favor of the admission of a confession into evidence).[2] Furthermore, the interrogation of the appellant lasted only one and one-half hours and was done at Officer Robinson's desk, with Investigator Dickey occasionally helping. See Shoffner, No.03C01-9403-CR-00113, 1995 WL 382628, at *3. Additionally, the appellant graduated high-school, in 1981, as basically a "B" student and had attended college for approximately one and one-half years. Moreover, the appellant stated that he was reading at the Martin College Library when the police asked him to return to the police station and that the appellant "[goes to the library] often to read any about theological or Bible or anything like that. Do a lot of research."

The appellant contends that he was not informed that he was signing a Miranda waiver and that he did not know that he was signing a confession. He claims that Officer Robinson

---

[2] Officer Robinson asserted that he discussed a waiver containing the following Miranda rights with the appellant:

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and have him with you during questioning.

If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.

If you decide to answer any questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

handed him papers to sign as "basic procedure." The appellant testified that "... when I got [to the police station], I set [sic] down. Then they showed this piece of paper to me. And in this piece of paper, they said this is just basic procedure, so I signed it." Additionally, the appellant asserted that [the statement is] not my words. That's not what I told him . . . . It does not contain – put anything that I told them, at all."

Furthermore, the appellant contends that he involuntarily confessed as a result of being threatened by Investigator Dickey. When Investigator Dickey felt that the appellant was not telling the officers the entire truth, he told the appellant that if he did not start telling the truth that he would "put his shoe up [the appellant's] ass." However, at trial, Investigator Dickey testified that:

> I told [the appellant], as a figure of speech, that [I] would put my shoe up his ass, within the judicial system. And I made it clear to him that I did not mean that as no physical threat or physical harm, whatsoever. That I meant that within the judicial system. And that's the way I phrase it, and that's the way I worded it, and that's the way I meant it.

Investigator Dickey stated that he made it clear to the appellant that he did not intend for his comment to result in a confession. Additionally, Investigator Dickey asserted that, after he made the comment, the appellant never appeared to be physically afraid. He maintained that the appellant dropped his head in his hand and said, "All right. I'm going to tell you what happened." Furthermore, the appellant never stated that Investigator Dickey's comment made him afraid. Moreover, the appellant testified that Investigator Dickey left not long after the comment was made, but Officer Robinson stayed and gave the appellant a statement to sign.

Based upon the forgoing, we conclude that, although Investigator Dickey's statement appears to be coercive, there is no proof in the record to show that the appellant's will was overborne, resulting in an involuntary confession.[3] Upon consideration of the totality of the circumstances, including the appellant's education, voluntary cooperation with the police, and knowledge of his constitutional rights, we agree with the trial court that the appellant voluntarily confessed and that the confession was properly admitted into evidence. See State v. Carter, No. 02C01-9711-CC-00424, 1998 WL 4603256, at * 8 (Tenn. Crim. App. at Jackson, August 10, 1998), perm. to appeal granted, (Tenn.1999).

Additionally, the appellant claims that, at some point during questioning, he requested that his attorney be called. Furthermore, the appellant contends that he also attempted to leave the police station, but Investigator Dickey shoved him back into his chair. The Sixth Amendment to the

---

[3] Cf. State v. Smith, 933 S.W.2d 450, 455-56 (Tenn. 1996)(stating that when a social worker made it clear that she could not promise the defendant freedom from prosecution but that, in her experience, the D.A. was more lenient on those who confessed, the confession was still voluntary); State v. Greer, No.02C01-9110-CC-00221, 1992 WL 386313, at *1 (Tenn. Crim. App. at Jackson, December 30, 1992)(finding that officer's statement that "if a person cannot tell the truth after he gets caught, then 'there is no help for him'" was not coercive). But see Williams v. State, 212 S.W.2d 383, 384-85 (Tenn. 1948)(concluding that an officer drawing back his hand as if to strike the defendant after threatening to whip the defendant was a sufficient threat to render the confession involuntary).

United States Constitution grants the criminally accused the right to counsel. However, this right only attaches after the initiation of adversary criminal proceedings. Davis v. United States, 512 U.S. 452, 456, 114 S. Ct. 2350, 2354 (1994). Regardless, "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning." Id. at 457, 2354 (citing Miranda, 384 U.S. at 469-473, 86 S. Ct. at 1625-1627). This court has stated:

> The Fifth and Fourteenth Amendments to the United States Constitution require that once a person in custody requests counsel, all interrogation must cease until an attorney is present. Article I, section 9, of the Tennessee Constitution provides similar, albeit broader, protection for the accused.

State v. Farmer, 927 S.W.2d 582, 593-94 (Tenn. Crim. App. 1996)(citation omitted). Accordingly, once an appellant invokes his right to counsel, he cannot be questioned regarding an offense unless an attorney is actually present. Davis, 512 U.S. at 458, 114 S. Ct. at 2355. Furthermore, "[w]hether the appellant did or did not make an equivocal or unequivocal request for an attorney is a question of fact." Farmer, 927 S.W.2d at 594.

Both Officer Robinson and Investigator Dickey denied that the appellant ever requested an attorney. They further denied that the appellant had ever attempted to leave or that he had been prevented from leaving the police station. This was an issue of credibility for the trial judge to decide. See Kelly, 603 S.W.2d at 728-729. The record is clear that the trial court did not accredit the appellant's contention, stating:

> I'm going to overrule the motion to suppress. I think on any motion to suppress, the Court has to choose which testimony they believe and which they don't. And I just feel like a person of Mr. Burgess' obvious intelligence, his age, his demeanor, it's hard for me to believe that that is what happened. So, I'm going to overrule the motion to suppress.

### C. Sikes' Statement

The appellant contends that the trial court erred by allowing Rickey Sikes' statement to be entered into the record as substantive evidence.[4] The appellant claims that the jury should have only considered Sikes' statement for impeachment purposes, not as substantive evidence. However,

---

[4] Sikes' statement to Officer Robinson indicates that the appellant admitted to Sikes that the appellant had hit the victim. Specifically, Sikes' statement contained the following language:

[Officer Robinson's notations of the March 16, 1998, meeting with Sikes indicated] Rickie did say that after the incident [the appellant] told him the child was crying and he had to discipline her by tapping her.

. . . .

Q. Not verbatim, but did [the appellant] ever say anything to the effect that the child was crying and he tapped her?

A. Yes.

the State argues that the statement was properly admitted as substantive evidence under Tenn. R. Evid. 803(5) as a past recollection recorded.[5] We agree.

Tenn. R. Evid. 803(5) states that, if the following requirements are met, a statement may be admitted into evidence:

> [there must be a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witnesses's memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Furthermore, this rule allows the statement to be used as evidence even if the witness has some recollection of the events but cannot recall enough to testify "fully and accurately." Tenn. R. Evid. 803(5), Advisory Commission Comments.

Sikes' statement satisfies all of the requirements of Tenn. R. Evid. 803(5). Sikes testified that he did not remember everything that he had previously told Investigator Dickey. Sikes further maintained that the information in the statement was accurate. Additionally, Sikes signed his statement in three separate places, indicating his adoption of that version of events. Accordingly, Sikes' statement could properly be considered by the jury as substantive evidence. See State v. Mathis, 969 S.W.2d 418, 421-22 (Tenn. Crim. App. 1997).

The appellant additionally contends that the trial court erred in allowing the State to introduce Sikes' statement as an exhibit for the jury to take to the jury room during deliberations. We agree. Nevertheless, although the trial court should have allowed the State to only read Sikes' statement into the record, we conclude that allowing the statement to be filed as an exhibit constitutes harmless error. State v. Davidson, No. M1997-00130-CCA-R3-CD, 2000 WL 622256, at *3 (Tenn. Crim. App. at Nashville, May 12, 2000); see also State v. Sneed, No.03C01-9702-CR-00076, 1998 WL 783330, at *5 (Tenn. Crim. App. at Knoxville, November 5, 1998), perm. to appeal denied, (Tenn. 1999).

## D. Sufficiency of the Evidence

The appellant argues that the State produced insufficient evidence of his "knowing" abuse of the victim in order to sustain his conviction of first degree murder. We disagree. Upon the appellant's challenge to the sufficiency of the evidence, this court will determine if any "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). This analysis applies to a guilty verdict based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn.

---

[5] In Tennessee, the general rule is that hearsay evidence, an out-of-court statement offered to prove the truth of the matter asserted, will not be admitted into evidence. Tenn. R. Evid. 801 & 802. However, Tenn. R. Evid. 803(5) contains a past recollection recorded exception to the prohibition against the admission of hearsay evidence.

Crim. App. 1990), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, before a conviction may be sustained by circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the [appellant]." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

Additionally, this court will not reweigh or reevaluate the evidence presented at trial. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). In other words, the trier of fact, and not the appellate courts, resolves all questions concerning witness credibility and the weight and value to be given the evidence, as well as all factual issues raised by the evidence. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). Furthermore, on appeal, this court will accord the State the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Accordingly, because the jury's verdict replaces the presumption of the appellant's innocence with a presumption of the appellant's guilt, the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tenn. Code Ann. § 39-13-202(a)(2)(1997) defines first degree murder as a killing committed in the perpetration of aggravated child abuse. Furthermore, the only mental state required is the intent to commit the underlying felony, i.e., the State must prove the appellant knowingly committed the aggravated child abuse. Id. Additionally, aggravated child abuse is the knowing treatment of a child under the age of eighteen, other than by accidental means, in such a manner as to inflict serious bodily injury to the child. Tenn. Code Ann. §§ 39-15-401(a)(1997) & 39-15-402(a)(1)(1997). Tenn. Code Ann. § 39-11-106(20)(1997) states that "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Moreover, if the child is less than six years of age, the offender is punished as a class A felon. Tenn. Code Ann. § 39-15-402(b).

The appellant argues that there is no evidence in the record to suggest that he "knowingly" abused the victim. The appellant repeatedly maintains that his statement is the sole proof that he committed the abuse and that his statement only proves that he accidentally hit the victim. This is not the case. In his statement, the appellant makes the following references to hitting the victim:

> [The victim] was crying and agitated and I hit her in the stomach.
> . . . .
> I laid her down in my lap, then once [Rivers] left she kept on crying and I accidentally hit her in the stomach.
> . . . .
> I was telling her to be quiet, I hit her harder than I meant to.

Additionally, the appellant, in his statement, claimed that he removed the victim's clothes to see if he had bruised her. Furthermore, the appellant stated that he had not confessed earlier to the police because he was scared. The appellant also indicated that he was sorry that this incident occurred.

The evidence adduced by the State at trial established that, on the day of the murder, Rivers and the victim picked up the appellant from his home at approximately 4:00 or 4:30 p.m. The victim was in the sole custody of Rivers and the appellant from the time they left Pulaski that afternoon until the time they returned that evening. Moreover, Rivers testified that the victim was in the sole custody of the appellant while Rivers retrieved the diaper bag from the car, used the restroom, and tidied her bedroom. Furthermore, neither Rivers nor the appellant testified that the victim had somehow harmed herself or that the injury could have been inflicted by someone else.

Additionally, Dr. Harlan testified that the victim died as a result of internal bleeding from a lacerated liver, and that the laceration was caused by a "blow to the abdomen from some object: a fist, an open hand, a boot, a shoe, a baseball bat, [or] a cow horn." He maintained that death occurred within a few hours of injury. Moreover, Dr. Harlan stated that the victim would have been exhibiting symptoms 15 to 30 minutes after the injury. In his opinion, in order to sustain such an injury "[would require] a blow or blows of considerable force."

Furthermore, Sikes' statement indicated that the appellant had told Sikes that he had "tapped" the victim because she was crying. Additionally, the appellant's own statement suggested that the appellant had hit the victim, but that he had hit her harder than he intended. Based upon these facts, the jury could have reasonably concluded that the appellant inflicted the fatal blow to the victim, and did so with the awareness that hitting a sixteen-month-old child in the stomach was reasonably certain to cause serious bodily injury to that child. See State v. Godsey, No. E1997-00207-CCA-R3-DD, 2000 WL 1337655, at *26 (Tenn. Crim. App. at Knoxville, September 18, 2000); State v. Rhodes, No. M1999-959-CCA-R3-CD, 2000 WL 264327, at *5 (Tenn. Crim. App. at Nashville, March 10, 2000):

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE